**A.J., by his mother and next friend, L.B., on behalf of himself and all others similarly situated, Appellant,**

**v.**

**David KIERST, Jr., in his official capacity as Juvenile Officer; Jim Morrison, in his official capacity as Director of Residential Services; Sherman Williams, in his official capacity as Director of Detention; Judge Edith L. Messina, in her official capacity as chief administrative officer of juvenile detention and as Judge of the Juvenile Division of the Sixteenth Judicial Circuit of the State of Missouri, Appellees. (Two Cases)**

Nos. 94–2449, 94–3586.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 13, 1995.

Decided June 1, 1995.

Rehearing Denied July 7, 1995.

Arthur A. Benson, Kansas City, MO, argued (Veronica Johnson, Kansas City, MO, and David Lambert, San Francisco, CA, on the brief), for appellant.

William H. Sanders, Kansas City, MO, argued (Peter B. Sloan on the brief), for appellee, Edith Messina.

J. Earlene Farr, Kansas City, MO, argued, for appelles, Sherwin Williams, Jim Morrison and David Kierst.

Before McMILLIAN, Circuit Judge; HEANEY, Senior Circuit Judge; and MORRIS SHEPPARD ARNOLD, Circuit Judge.

HEANEY, Senior Circuit Judge.

Pursuant to 42 U.C.S. §§ 1983 and 1988, A.J., a 16–year-old minor, filed this class action in the United States District Court for the Western District of Missouri on behalf of himself and others similarly situated (collectively "plaintiffs"; separately "A.J." and "the class") to challenge the constitutionality of certain policies, practices, and conditions at the Jackson County Juvenile Justice Center

("JCJJC").[1] The district court ultimately certified a class to consist of all persons who had been detained at the JCJJC since November 15, 1989. A.J. and the class sought injunctive relief, and A.J. individually claimed monetary damages for injuries he incurred as a result of the center's allegedly unconstitutional practices. The court granted summary judgment to defendants[2] on overcrowding and the use of floor mattresses,[3] two of a number of issues alleged by plaintiffs to be unconstitutional, and held in favor of defendants on all remaining issues after a court trial. The court granted summary judgment to defendants on A.J.'s claim that he received improper medical care and denied summary judgment on A.J.'s claim that he was unlawfully placed in isolation. A.J.'s isolation claim was ultimately tried to a jury, which awarded $42 in damages. The court awarded attorney's fees in the sum of $24,428 to one of plaintiffs' counsel on A.J.'s jury claim after declining to award fees to plaintiffs' other counsel.

On appeal plaintiffs argue that the district court (1) erred as a matter of law in granting summary judgment against plaintiffs on the issues of overcrowding and the use of floor mattresses; (2) abused its discretion in conditioning communications between plaintiffs' counsel and class members on the requirements that plaintiffs exhaust alternative resources and demonstrate a compelling need; and (3) erred in its rulings on various issues at trial which, combined, denied plaintiffs their right to a fair trial. In addition, plaintiffs argue the court erred in limiting attorneys' fees to one attorney and in holding that plaintiffs did not "prevail" under 42 U.S.C. § 1988 on their claims for injunctive relief.

We affirm the district court's order granting summary judgment in defendants' favor. We agree with plaintiffs that the district court erred in conditioning communications between plaintiffs' counsel and class members on the requirements that plaintiffs exhaust other resources and demonstrate a compelling need, but hold that the court's order restricting access resulted in no prejudice to plaintiffs on the two issues appealed by them: overcrowding and the use of floor mattresses. We further find that the court's rulings at trial did not, either individually or collectively, deprive plaintiffs of their right to a fair trial. Finally, we find that the district court erred in limiting attorneys' fees to only one attorney for A.J.'s successful jury claim, but that the court did not err in denying fees for plaintiffs' injunctive claims.

### I.

#### A. Summary Judgment Claim

We first address plaintiffs' argument that the district court erred in granting summary judgment to defendants on the issues of overcrowding and the use of floor mattresses.

We review a district court's grant of summary judgment de novo, *United States ex rel. Glass v. Medtronic, Inc.,* 957 F.2d 605, 607 (8th Cir.1992), applying the same standards used by the district court. *Kuhnert v. John Morrell & Co. Meat Packing, Inc.,* 5 F.3d 303, 304 (8th Cir.1993). The question before us is whether the record, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct.

---

1. Plaintiffs alleged that numerous policies, practices, and conditions constituted punishment, in violation of the Due Process Clause of the Fourteenth Amendment of the United States Constitution, and Article I, § 10 of the Missouri Constitution.

2. Plaintiffs originally named as defendants Lawrence Myers, David Jackson, and Forestal Lawton, administrators at the JCJJC. They subsequently filed an amended complaint in which they named two additional administrators, David Spivey and Otis Spears, as defendants. Judge H. Michael Coburn, then Juvenile Judge for the Six-

teenth Judicial Circuit for the State of Missouri, was added as a judicial defendant. During the pendency of the suit, each defendant was succeeded in office and his successor was substituted as a party. *See* Fed.R.Civ.P. 25(d).

3. In addition, the court granted summary judgment on plaintiffs' claims with respect to health and safety concerns and the physical condition of the center. Upon motion by plaintiffs, the court set aside its summary judgment on plaintiffs' health and safety claims and allowed those claims to be tried.

2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Our court construes civil rights pleadings liberally. *Davis v. Hall*, 992 F.2d 151, 153 (8th Cir.1993). Such pleadings, however, must not be conclusory and must set forth facts that state a claim as a matter of law. *Nickens v. White*, 536 F.2d 802, 803 (8th Cir.1976).

■ In memoranda of law filed with the district court the parties agreed that the Due Process Clause of the Fourteenth Amendment, and not the Cruel and Unusual Punishments Clause of the Eighth Amendment, is the appropriate measuring stick for evaluating conditions in a juvenile facility. The due process standard was applied by the district court, which, quoting with approval Judge Ferguson's concurring opinion in *Gary H. v. Hegstrom*, 831 F.2d 1430, 1437 n. 3 (9th Cir.1987), noted that " '[t]he "evolving standards of decency" against which courts evaluate the constitutionality of . . . conditions certainly provide greater protection for juveniles than for adults.' " *See* Jt.App. at 194. We note, as did the district court, that the Supreme Court has not yet articulated the appropriate federal standard by which to judge conditions in state juvenile facilities. *See Ingraham v. Wright*, 430 U.S. 651, 669 n. 37, 97 S.Ct. 1401, 1411 n. 37, 51 L.Ed.2d 711 (1977) (expressly reserving the question whether the Eighth Amendment applies to juvenile institutions). We agree with the court that, by virtue of plaintiffs' status as pretrial detainees, the more protective Fourteenth Amendment, and not the Eighth Amendment, applies. *See Boswell v. Sherburne County*, 849 F.2d 1117, 1120–21 (8th Cir.1988) (citing *Bell v. Wolfish*, 441 U.S. 520, 523, 99 S.Ct. 1861, 1865–66, 60 L.Ed.2d 447 (1979)); *see also Hegstrom*, 831 F.2d at 1437 (Ferguson, J., concurring) ("Where . . . an institution is noncriminal and nonpenal, allegations of unconstitutional conditions of confinement are governed by the more protective standard of the Fourteenth Amendment, rather than the Eighth Amendment."); *Santana v. Collazo*, 714 F.2d 1172, 1179 (1st Cir.1983), *cert. denied*, 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984) ("[J]uveniles . . . who have not been convicted of crimes, have a due process interest in freedom from unnecessary bodily restraint which entitles them to closer scrutiny of their conditions of confinement than that accorded convicted criminals.").

■ In applying the due process standard to juveniles, we cannot ignore the reality that assessments of juvenile conditions of confinement are necessarily different from those relevant to assessments of adult conditions of confinement. *See Santana*, 714 F.2d at 1179. Juveniles subject to pretrial detention have "not as yet had a 'judicial determination of probable cause which the Fourth Amendment requires as a prerequisite to extended restraint of liberty following arrest[,]' " *United States ex rel. Martin v. Strasburg*, 513 F.Supp. 691, 714 (S.D.N.Y.1981) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54 (1975)), *aff'd*, 689 F.2d 365 (2d Cir.1982), *rev'd sub nom. Schall v. Martin*, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984); are, in some instances, before the court on charges in unverified petitions, *e.g.*, delinquency petitions filed on information and belief, *id.;* and are in a system whose purpose is rehabilitative, not penal, in nature. *See Santana*, 714 F.2d at 1178 (citing, among other cases, *Pena v. New York State Div. For Youth*, 419 F.Supp. 203, 206 (S.D.N.Y.1976) (objectives of juvenile justice system are to provide measures of guidance and rehabilitation)). In addition, juveniles are frequently detained for reasons entirely separate from those associated with adjudication of charges. Some are detained as a result of neglect or abusive home environments and are held in protective custody, *e.g.*, are "status offenders"; some are runaways; some are simply undisciplined. For these reasons, we conclude that, as a general matter, the due process standard applied to juvenile pretrial detainees should be more liberally construed than that applied to adult detainees.

■ Plaintiffs do not dispute that overcrowding alone is insufficient to create a due process violation. *See Vazquez v. Carver*, 729 F.Supp. 1063, 1069 (E.D.Pa.1989). In evaluating overcrowded conditions courts have looked to a number of factors, including

the size of detainees' living space, the length of time detainees spend in their cell each day, the length of time of their confinement, and their opportunity for exercise. *See Campbell v. Cauthron,* 623 F.2d 503, 506–07 (8th Cir. 1980); *Albro v. Onondaga County,* 681 F.Supp. 991, 995 (N.D.N.Y.1988); *Reece v. Gragg,* 650 F.Supp. 1297, 1301–03 (D.Kan. 1986); *see also Carver v. Knox County,* 753 F.Supp. 1370, 1387 (E.D.Tenn.1989), *aff'd in part, rev'd in part,* 887 F.2d 1287 (6th Cir. 1989), *on remand,* 753 F.Supp. 1398 (E.D.Tenn.) *cert. denied,* 495 U.S. 919, 110 S.Ct. 1949, 109 L.Ed.2d 311 (1990).

Rooms at the JCJJC are approximately 69 feet in size. Prior to July 1990 the center lodged as many as three youths in a room due to an unprecedented increase in the number of juveniles. To accommodate the additional youths, floor mattresses were used in rooms in addition to already existing single beds. Jt.App. at 241. In July 1990 the facility terminated its practice of lodging more than one juvenile in a room. *Id.* at 523. Beds affixed to the walls were removed, leaving only one bed per room. *Id.* at 183. A dormitory is currently used to accommodate youths for sleeping purposes when there is a "special need," in which case floor mattresses are used. *Id.* at 58. The juveniles' rooms are used primarily for sleeping. There is evidence that detainees are required to remain locked in their rooms for "nap time" immediately after school from 2:30 p.m. until 4:30 p.m. to allow for staff shift changes. *Id.* at 591. Except when sleeping at night and during "nap time" in the afternoon, detainees are not restricted to their rooms. They are permitted to move about in common areas

and have access to a game room, or dayroom, which is of "ample" size (53 square feet per juvenile). *Id.* at 523. The dayroom is lined with windows that allow natural light into the room. It is equipped with tables, chairs, books, and televisions. *Id.* at 244. The juveniles, additionally, have access to an indoor gymnasium equipped with a basketball court and weight equipment, which is "used frequently during the day," although activities appear to be disorganized and unplanned. *Id.* at 582. According to JCJJC statistics, the average length of stay per juvenile in 1989, the year A.J. was detained, was thirteen days. The average length of stay per juvenile was ten days in 1990 and 1991.[4] *Id.* at 610. These facts, in our view, do not constitute deprivations of such magnitude as to violate plaintiffs' due process rights.[5]

■ The district court similarly did not err in concluding that no violation existed with respect to the center's use of floor mattresses. It is uncontroverted that juveniles were subjected to sleeping on floor mattresses in their rooms when the population at the center peaked in the late 80s. They were required to do so, however, only for the relatively short period of time they were detained.[6] Floor mattresses, as noted, are now used in the dormitory for sleeping purposes when there is a special need (apparently to accommodate additional youths when the center is at full capacity). Based on the totality of circumstances presented here, we do not believe that the center's past and present use of floor mattresses amounts to a deprivation of such severity as to deprive

---

4. Plaintiffs dispute the court's factual findings with respect to the juveniles' average length of detention, noting that "there was substantial evidence before the court that children were confined in the JCJJC for much longer than the 'brief period of time'" relied upon by the court. Appellant's Br. at 22. Specifically, they refer to the findings of one of their expert witnesses, Ira Schwartz, who reported that "[m]any youths are being held in secure detention [while awaiting placement] when less secure facilities would be more appropriate.... [I]n December, 1989 ... 31 residents were being held in the JCJJC awaiting placement and ... three of these youth had been at the JCJJC for five months." Jt.App. at 478. However true this may be, we do not see how this fact renders unreliable the district

court's representations of *the average* number of days a juvenile is detained.

5. We note in this regard that the Supreme Court in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), found it acceptable to house two adult pretrial detainees in 75 square feet of space containing a double bunk bed where they were confined to this area for six to seven hours a day (primarily for sleeping purposes) and were detained for generally less than sixty days.

6. A.J. was detained for a total of fifteen days, during which time he slept on a floor mattress in a single room.

plaintiffs of their due process rights.[7]

## B. *Access Claim*

■ Plaintiffs' counsel sought repeatedly to interview the juveniles detained at the JCJJC to prove the existence of past or present unconstitutional conditions of confinement. The first such attempt occurred at a May 1990 hearing when counsel requested an order granting access to the juveniles then detained at the center. Jt.App. at 632. The court denied plaintiffs' request on the grounds that each of the juveniles detained at the facility was represented by counsel, either personally retained or court-appointed, and that each was free to raise issues pertaining to constitutional deprivations on his or her own. *Id.* at 636. In a July 3, 1990, order the court reaffirmed its position, explicitly requiring that plaintiffs' counsel exhaust alternative resources and demonstrate a compelling need before the court would consider disturbing "the long-established protection of confidentiality for juveniles" under Missouri law. *Id.* at 78. Plaintiffs again moved the court for access in July 1991, arguing that the juveniles had a right of access to class counsel separate and apart from their right to counsel on delinquency charges and that they could not prepare their case for trial without access to the juveniles. At a status conference on September 6, 1991, in response to counsel's final request to interview the juveniles, the court denied access stating that the necessary information concerning the policies and practices at the JCJJC could be obtained by reviewing the files and interviewing the employees of the center. *Id.* at 117. By order dated October 3, 1991, the district court formally denied plaintiffs' motion for access.[8]

Plaintiffs argue that neither the court's initial order of July 3, 1990, conditioning communication with class members on a showing of compelling need (a standard they

assert finds no support in caselaw) nor its final order of October 3, 1991, reveals any factual basis for the court's "sweeping ban on communications." Appellants' Br. at 12. Contrary to the dictates of *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981), the district court erred, they argue, in denying communications between plaintiffs' counsel and class members absent a clear record and specific findings that reflect the need for a ban. The court's order denying communications, plaintiffs argue, additionally restricted class members' rights to due process. As a result of the ban, plaintiffs assert that counsel was unable to inform the juveniles of the existence of the lawsuit or to obtain critical factual information about the conditions of their confinement, thus preventing A.J. and class counsel, as class representatives, from adequately fulfilling their duties under Fed.R.Civ.P. 23.

In response, defendants argue the district court's denial of access to class members was not an absolute ban on communications. The court rather required plaintiffs' counsel to make some showing that the information they sought from the juveniles was not available from other sources and that they had a compelling need for contact with members of the class that overcame the juveniles' rights to confidentiality. Br. of Appellees Kierst, Morrison and Williams at 6. Defendants rely on Missouri statutory provisions regarding the rights of juveniles in court proceedings which, they maintain, establish a clear statutory requirement of confidentiality. Section 211.271.3 of the Missouri Statutes provides that "reports and records of the juvenile court ... shall not be used for any purpose whatsoever in any proceeding, civil or criminal...." Mo.Ann.Stat. § 211.271.3 (1983). Section 211.321.1 further provides that

---

7. We note that had we concluded that the conditions were violative of plaintiffs' constitutional rights, we would be faced with the separate task of reviewing the record for evidence regarding the likelihood that the conditions would reoccur. Because we hold that the complained of conditions do not rise to the level of a constitutional violation, however, we need not pursue that inquiry.

8. Plaintiffs requested certification to bring an interlocutory appeal on the court's denial of their motion for access, which the district court denied. Plaintiffs subsequently appealed under 28 U.S.C. § 1292(b), and this court dismissed the appeal for lack of jurisdiction on the grounds that the appeal was premature.

[records of juvenile court proceedings] as well as all information obtained and social records prepared in the discharge of official duty for the court shall not be open to inspection or their contents disclosed, *except by order of the court to persons having a legitimate interest therein....*

Mo.Rev.Stat. § 211.321.1 (1983) (emphasis added). There are only four situations, defendants maintain, in which juvenile courts in Missouri have found such a "legitimate interest": (1) where the information is sought for the purposes of identification; (2) where the juvenile is charged with a serious crime for which he can be charged as an adult; (3) where a party seeks to impeach a juvenile witness; and (4) where the juvenile is not a party to the action. *See State v. Knupp,* 507 S.W.2d 360, 362 (Mo.1974); *State ex rel. Arbeiter v. Reagan,* 427 S.W.2d 371, 376 (Mo. 1968) (en banc); *State v. Wilson,* 755 S.W.2d 707, 711 (Mo.App.1988). Because plaintiffs' request did not fall within any of the recognized exceptions, defendants argue they cannot overcome the statutes' qualified prohibition against disclosing records of juvenile court proceedings. Defendants further argue that plaintiffs' counsel had the burden of showing a compelling need for access to individual detainees, which counsel failed to do. Plaintiffs were provided with a plethora of records describing the conditions at the JCJJC, visually inspected the center, and had access to employees who worked there. These resources, they contend, were more than adequate to allow plaintiffs to prepare and present their case.

It cannot reasonably be disputed that the court's conditions on communications between counsel and class members "created at least potential difficulties for [plaintiffs] as they sought to vindicate the legal rights of [the juveniles]." *Gulf,* 452 U.S. at 101, 101 S.Ct. at 2200. Plaintiffs argued before the district court, and we agree, that the juveniles' perceptions of the institution, its staff,

and its programs are relevant components of a comprehensive evaluation of institutional policy, for "proving a case of overcrowding is not [accomplished] simply [by] adding up the number of juveniles detained at any given time and dividing it by the number of beds...." Jt.App. at 638. The question before us is whether the district court's "limiting order ... is consistent with the general policies embodied in Rule 23, which governs class actions in federal court." *Gulf,* 452 U.S. at 99, 101 S.Ct. at 2199.

A trial judge has broad authority to supervise a class action and to issue orders regulating the conduct of parties and counsel. *Id.* at 100, 101 S.Ct. at 2200. That discretion, however, is not unlimited and "indeed is bounded by the relevant provisions of the Federal Rules [of Civil Procedure]." *Id.* An order limiting communications between parties and potential class members must be based "on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* at 101, 101 S.Ct. at 2200. "[S]uch a weighing—identifying the potential abuses being addressed—should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances." *Id.* at 102, 101 S.Ct. at 2201.

Contrary to this well-established law the district court made no discernible effort to weigh the state's interest in protecting the confidentiality of juveniles against the potential interference with the class members' rights. Apart from announcing that Missouri law mandates the imposition of strict measures of confidentiality to protect juveniles, the court made no findings of fact with respect to whether plaintiffs' counsel were engaged in or likely to engage in abusive tactics.[9] Additionally, the court rendered no findings with respect to whether access would be disruptive of administrative proce-

---

9. The court did not identify, and we are unable to find, any of the following abuses that courts and scholars have recognized as potentially hazardous in class action suits: (1) solicitation of direct representation of class members who are not formal parties; (2) solicitation of funds and agreements to pay fees; (3) solicitation by defen-

dants of requests to opt out; and (4) communications with class members that misrepresent the status or effect of the pending action. *See Gulf,* 452 U.S. at 100 n. 12, 101 S.Ct. at 2200; *Domingo v. New England Fish Co.,* 727 F.2d 1429, 1441 (9th Cir.1984) (citing Manual for Complex Litigation § 1.41 (1973)).

dures at the JCJJC or would otherwise compromise the safety of the juveniles and staff.

We are unaware of any cases, and defendants cite none, which hold that counsel for plaintiffs in class action proceedings have the burden of first exhausting alternative means of collecting information and demonstrating a compelling need before they will be permitted access to class members absent evidence of present or potential abuse. Requiring plaintiffs to first exhaust alternative resources puts plaintiffs in the awkward, if not untenable, position of having to first muster enough evidence to prove precisely that which influenced their decision to seek access in the first instance. Although we are mindful of the district court's power under Rule 23 to restrict certain communications, the court may not exercise that power " 'without a specific record showing by the moving party of the particular abuses by which it is threatened.' "[10] *Id.* (quoting *Coles v. Marsh,* 560 F.2d 186, 189 (3rd Cir.), *cert. denied,* 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977)).

Defendants' argument that Missouri law weighs heavily against granting access is equally unconvincing. The relied upon statutes are not dispositive of the issue of whether communications between class counsel and juvenile class members is necessarily prohibited. The statutes specifically refer to "reports" and "records" of juvenile court proceedings, *see* §§ 211.271.3 and 221.321.1, which, as is true in most states, are judiciously guarded. No mention is made, however, of the need to restrict communications between juveniles and counsel in class action or other proceedings, and we decline to stretch the statutes' reach that far. The district court understandably was concerned that direct communications with the juveniles, and testimony generated as a result thereof, might lead to breaches of confidentiality. The court, however, could have issued a carefully drawn order requiring adherence to

procedures that would have ensured the confidentiality of the juveniles (*e.g.,* a protective order limiting access to the juveniles' records to designated individuals), while at the same time permitting plaintiffs' counsel sufficient latitude to gather facts and advocate on behalf of the class.

We are additionally unpersuaded that the court properly restricted communications on the ground that the juveniles were already represented by independent counsel in delinquency and other matters before the Juvenile Court. Once the class was formed and certified, class counsel, and not counsel appointed or retained to represent the juveniles on altogether separate matters, had the obligation to represent class members, for judgment on the class's claims would have barred further action by the juveniles individually.

Accordingly, we find that the district court abused its discretion in conditioning communications between plaintiffs' counsel and class members on the requirements that plaintiffs exhaust alternative resources and demonstrate a compelling need. *See Gulf,* 452 U.S. at 100–101, 101 S.Ct. at 2200.

Having concluded that the district court erred in imposing unwarranted conditions on communications between counsel and class members, there remains the question of whether the court's grant of summary judgment on the two issues appealed by plaintiffs, overcrowding and the use of floor mattresses, should be set aside on the ground that the court's order restricting access materially hindered plaintiffs' efforts to marshall enough evidence to sustain their burden on summary judgment. Because we find that the court's order restricting access did not prejudice plaintiffs with respect to these two issues, we do not believe that the court's grant of summary judgment should be set aside. Had plaintiffs appealed the district court's denial of relief on the other practices,

---

10. The district court's concern that plaintiffs' motive for communicating with the juveniles was "to generate litigation" and to launch a fishing expedition "to go after money damages" is entirely unsupported by the record. *See* Jt.App. at 121, 636. There is no proof that plaintiffs' counsel wished to " 'drum up' participation in the proceeding," *Gulf,* 452 U.S. at 100 n. 12, 101

S.Ct. at 2200 n. 12, or recruit plaintiffs for damage claims. Plaintiffs' counsel assured the district court at the September 6, 1991, status hearing that they had specifically disavowed any interest in pursuing damage claims and that, even if given the opportunity to represent the juveniles in such claims, they would not do so. *See* Jt.App. at 115–16.

policies, and conditions challenged by plaintiffs, we might have reached a contrary result. The record on the issues of overcrowding and the use of floor mattresses, however, is sufficiently clear to allow us to affirm the court's decision that neither produced deprivations of such magnitude as to constitute violations of plaintiffs' due process rights.

## II.

Plaintiffs argue that the district court erred in other rulings which, combined, denied them their fundamental right to a fair trial. These include the district court's refusal to disqualify defense counsel for conflict of interest, the court's refusal to admit into evidence a report prepared by Lloyd Mixdorf, and the district court judge's refusal to disqualify himself. We address each argument in turn.

### A. *Refusal to Disqualify Defense Counsel*

■ Plaintiffs argue the district court erred in denying their motion to disqualify counsel for Judge John O'Malley, who was joined as a party defendant because of his position as Judge of the Juvenile Division of the Sixteenth Judicial Circuit of the State of Missouri during the pendency of plaintiffs' suit. Plaintiffs sought to disqualify the law firm hired to represent Judge O'Malley, Blackwell Sanders Matheny Weary & Lombardi ("Blackwell Sanders"), and two attorneys in that firm on the theory that their representation of O'Malley conflicted with their past and present representation of members of plaintiffs' class. Plaintiffs argue that a conflict of interest existed because Blackwell Sanders had in the past represented juveniles on delinquency charges as court-appointed counsel. With respect to counsels' present representation of class members, plaintiffs argue a conflict existed because of obligations the district court imposed upon defense counsel at pretrial hearings (in May 1990 and September 1991) at which the court expressed its belief that juveniles detained at the JCJJC were represented by counsel on pending delinquency charges and thus were free to raise unlawful conditions of confinement claims with their already retained or appointed counsel. Under the district court's

reasoning, plaintiffs argue, Blackwell Sanders was obligated to represent juveniles on claims of unlawful conditions of confinement while at the same time representing Judge O'Malley whose interests, as the judicial defendant, were plainly opposed to those of members of plaintiffs' class.

■ The sanction of disqualification rests in the discretion of the trial court. *Central Milk Producers Co-op. v. Sentry Food Stores, Inc.,* 573 F.2d 988, 991 (8th Cir.1978). Its determination will only be overturned upon a showing of abuse of the court's discretion. *Fred Weber, Inc. v. Shell Oil Co.,* 566 F.2d 602, 605 (8th Cir.1977), *cert. denied,* 436 U.S. 905, 98 S.Ct. 2235, 56 L.Ed.2d 403 (1978). The party seeking disqualification of his former counsel must bear the burden of proving that the present and prior representations are substantially related. *Duncan v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 646 F.2d 1020, 1028 (5th Cir.1981). In determining whether the past and present representations are "substantially related," the focus of the district court's inquiry should be on the precise nature of the relationship between the two representations. *Id.* at 1029.

The facts do not support a finding that Judge O'Malley's representation by attorneys in Blackwell Sanders conflicted with either the firm's past or present representation of members of plaintiffs' class. With respect to the law firm's former representation of members of the class, the majority of cases on which Blackwell Sanders served as court-appointed counsel involved representation of juveniles' mothers or custodians in custody or parental rights proceedings. Jt. App. at 149. The firm had represented juveniles on some delinquency matters, but this practice was quite rare. We do not believe that the firm's former practice of representing juveniles in custody matters, and its more limited practice of representing juveniles in delinquency matters, was sufficiently close to the core of plaintiffs' class claims to warrant disqualification of counsel for defendant O'Malley. Accordingly, we do not find that the firm's prior representation of juve-

niles was "substantially related" to its representation of Judge O'Malley.

With respect to the law firm's present representation of members of plaintiffs' class, defense counsel's obligation to represent juveniles on unconstitutional conditions-of-confinement claims was too speculative to present a conflict of interest with the firm's representation of the judicial defendant. For a conflict to have arisen, attorneys at Blackwell Sanders would have had to have been selected to represent members of plaintiffs' class under Jackson County's appointment process, which, like many states, follows the alphabet.[11] The mere possibility that defense counsel might have been selected to serve as court-appointed counsel does not result in a present conflict of interest. Further, because lawyers at Blackwell Sanders did not, at the time plaintiffs filed their motion to disqualify, represent any juveniles at the JCJJC and pledged to withdraw from future representation of juveniles in delinquency matters, their present representation of Judge O'Malley presented no conflict. The district court did not abuse its discretion in denying plaintiffs' motion to disqualify counsel for the judicial defendant.

### B. *The Mixdorf Report*

■■■ Plaintiffs next argue that the court erred in refusing to admit into evidence a report prepared by Lloyd Mixdorf, an expert consultant, who was hired by defendants in August 1989 (more than three months prior to the initiation of plaintiffs' suit) to examine

the JCJJC and to recommend possible improvements in the center's operations. Plaintiffs sought to introduce Mixdorf's report, which included the author's opinions and conclusions with respect to various deficiencies at the JCJJC,[12] to prove that defendants had actual knowledge of unlawful conditions and practices at the center prior to A.J.'s detention. The court refused to admit the report based on plaintiffs' failure to designate Mixdorf as an expert pursuant to the court's September 6, 1991, discovery scheduling order[13] and on plaintiffs' assurance at a pretrial hearing that they intended to call Mixdorf as a fact witness only, not as an opinion witness.

■■■ The trial judge has wide discretion in ruling on the admissibility of evidence. *Dillon v. Nissan Motor Co., Ltd.,* 986 F.2d 263, 270 (8th Cir.1993). His decisions will not be disturbed absent proof of "clear and prejudicial abuse" of that discretion. *Id.; Roth v. Black & Decker, U.S., Inc.,* 737 F.2d 779, 783 (8th Cir.1984). The district court did not err, we believe, in refusing to admit the Mixdorf report. As noted, plaintiffs offered the Mixdorf report at trial during their questioning of defendant Myers. This action, however, was contrary to a pretrial agreement with the court and defendants that neither Mixdorf's testimony nor his report would be offered for the limited purpose of showing his knowledge of the conditions at the JCJJC at the time he visited the facility in 1989.[14] According to the agreement,

---

11. Pursuant to Local Rules, appointments of members of the Jackson Country Bar to represent indigent juveniles and adults in Juvenile Court proceedings are made in alphabetical order from a list of all attorneys who are registered with the Supreme Court. *See* Local Rule 21.6.1.2.

12. Among Mixdorf's conclusions and opinions were that education at the center is "woefully inadequate" and that "[o]f utmost concern is the dramatic absence of physical plant policies, procedures, and practices to protect juveniles from injury and death due to fire and smoke." Jt.App. at 366, 369.

13. The court's discovery order provided, in pertinent part, that plaintiffs' experts' reports "shall be submitted by December 1, 1991," and that the reports "shall be in written affidavit form, ...

[including] a complete statement of all opinions to be expressed, and the basis and reasons therefore[.]" Jt.App. at 83, 85. Plaintiffs indicated their intention to call Mixdorf as an expert witness for the first time when they served notice on defendants on March 4, 1992, of their intent to depose Mixdorf at his office in Laurel, Maryland.

14. At a March 26, 1992, hearing on defendants' motion for a protective order in which defendants sought to bar plaintiffs' deposition of Mixdorf, the court stated that plaintiffs could depose Mixdorf, but only on the condition they inquire into fact issues relating to his observations of the facility. Plaintiffs' counsel agreed to limit their inquiry of Mixdorf to fact issues, noting that they "absolutely [did] not intend to offer and will not offer any opinion testimony by him." Mar. 26, 1992, Hrg. Tr. at 9. Counsel further assured the court that

plaintiffs were not to ask Mixdorf about any of his opinions or recommendations at either his deposition or at trial, or to attempt to introduce Mixdorf's report for its opinions and recommendations. Although plaintiffs claim that they did not offer the report as expert testimony but rather sought its admission to establish defendants' knowledge, there is evidence that plaintiffs, in fact, sought to introduce the report for its opinion testimony. At trial plaintiffs' counsel asked Myers, "Now what were Mr. Mixdorf's concerns about staff training?" Trial Tr. at 170. Defendants strenuously objected on the ground that plaintiffs strayed from their promise not to inquire into any of Mixdorf's conclusions or opinions. *Id.* The court denied the admission of the report in plaintiffs' case-in-chief and as an offer of proof for the reasons noted above. *Id.* at 175. Significantly, plaintiffs' counsel made no attempt to offer only nonopinion portions of the report, a tactic that would have achieved plaintiffs' stated objective of bringing into evidence Mixdorf's factual observations about the facility.[15] Accordingly, we find no abuse of discretion by the district court in refusing to admit the Mixdorf report.

## C. *The District Judge's Refusal to Disqualify Himself*

■■■■ Plaintiffs lastly argue that the court erred in denying their motion to disqualify the district court judge pursuant to 28 U.S.C. § 455. Under section 455(a) a judge must disqualify himself or herself in any proceedings in which his or her impartiality might reasonably be questioned. *Pope v. Federal Express Corp.,* 974 F.2d 982, 985 (8th Cir.1992). The test for determining whether a judge's impartiality might reason-

ably be questioned is an objective one. *United States v. Poludniak,* 657 F.2d 948, 954 (8th Cir.1981), *cert. denied,* 455 U.S. 940, 102 S.Ct. 1431, 71 L.Ed.2d 650 (1982). The relevant inquiry thus is whether the "average person on the street" would have a factual basis to doubt the impartiality of the judge under the circumstances. *Pope,* 974 F.2d at 985. Disqualification motions are committed to the sound discretion of the district court and will not be disturbed absent an abuse of that discretion. *Id.*

■■■ Plaintiffs offered a potpourri of reasons in support of their motion to disqualify the district court judge, each of which was addressed quite competently by the district court in its order denying disqualification. On appeal plaintiffs raise several arguments they raised before the district court and, in addition, offer two new reasons not presented to the court.

Among the reasons plaintiffs proffered before the district court were that the judge displayed a "hostile and accusatory demeanor" toward plaintiffs' counsel, without a "scintilla of factual basis in the record" told out-of-town counsel that he was "merely here to generate money" and "to generate litigation," prejudged plaintiffs' entitlement to attorneys' fees, and hindered plaintiffs' case through his discovery rulings. Jt.App. at 93–94. Although unable to identify the source of the judge's apparent bias, plaintiffs additionally argued that the judge's status as a judicial defendant in an earlier suit alleging unconstitutional conditions of confinement at a juvenile facility under his jurisdiction was reason to question the judge's impartiality. In that case, *L.Z. v. Parrish,* No. 77–3277–CV–S (W.D.Mo.), the plaintiff, as in this case, was

---

[t]he [Mixdorf] report is offered not because we intend to offer that into evidence, but just to demonstrate that [Mixdorf] had factual familiarity with the juvenile detention facility. We do not intend to put his opinions, recommendations or conclusions into evidence or before the Court, but we do want to get from him his factual observations that led to that report. *Id.*

**15.** It is questionable whether even the nonopinion portions of the report would have added substantively to plaintiffs' case. The district court expressed skepticism about the factual val-

ue of Mixdorf's report, noting at the hearing on defendants' motion for a protective order that:

What is really bothering me, Mr. Benson, I can't see how you can get much factual information out of [Mixdorf]. His report itself is even captioned recommendations. And it appears to me that in his entire report he states opinions and conclusions. So I don't see how you can get just factual stuff out of it.

Hrg. Tr., Mar. 26, 1992, at 8. Having reviewed the report, we agree with the district court that it consists primarily of Mixdorf's conclusions and recommendations.

represented by attorneys employed by the National Center for Youth Law (formerly the National Juvenile Law Center), who purportedly deposed the district judge and negotiated a consent injunction against him. We have considered each of plaintiffs' arguments and find that the district court judge, after careful consideration, properly refused to recuse himself.

 The judge's demeanor toward plaintiffs' counsel and his statements to David Lambert, who appeared *pro hac vice* on behalf of plaintiffs, were not entirely appropriate. As noted above, there is no record evidence that plaintiffs' counsel sought to drum up litigation or to generate money damages. The district court judge suggested as much at pretrial hearings at which counsel argued persuasively that access to the juveniles was imperative to the preparation and presentation of their case. Although we do not condone the judge's comments, we do not believe that they alone are grounds for disqualification. A controversy between a trial judge and an attorney does not require disqualification of the judge in the absence of proof of bias or personal prejudice to the parties. *Gilbert v. City of Little Rock, Ark.,* 722 F.2d 1390, 1399 (8th Cir.1983). Whatever animosity existed between the district court judge and counsel is not relevant to the consideration of whether the judge demonstrated bias or personal prejudice to the parties. *See People Helpers Found., Inc. v. City of Richmond, Va.,* 12 F.3d 1321, 1325–26 (4th Cir.1993) (judge's comments, while perhaps caustic, are not indicative of personal bias against the defendant). Plaintiffs' argument that the judge prejudged plaintiffs' entitlement to attorney's fees similarly rests on the belief that the judge harbored ill motives in questioning the propriety of counsel's—especially out-of-town counsel's—interest and involvement in plaintiffs' case. The judge's stated reasons for limiting attorneys' fees to one counsel (a subject we take up next in our opinion) are not persuasive. We do not believe, however, that they form the proper factual basis for doubting the impartiality of the judge under the circumstances presented here. As for plaintiffs' assertion that the court impeded their ability to prepare their case by its rulings on discovery and other

matters, we cannot quarrel with the court's assertion that it runs a "tight ship." *See* Jt.App. at 162. That plaintiffs did not always receive favorable rulings is not, by itself, grounds for disqualification. *Ouachita Nat. Bank v. Tosco Corp.,* 686 F.2d 1291, 1300 (8th Cir.1982).

Plaintiffs' final argument before the district court, that the judge's involvement as a judicial defendant in an earlier suit alleging unconstitutional conditions of confinement at a juvenile facility, also does not serve as grounds for disqualification. The judge was named as a defendant in the *L.Z.* case in his official capacity as a Missouri circuit court judge. He had no direct involvement with the case. Contrary to plaintiffs' suggestion that he was deposed, the judge noted in his order denying plaintiffs' motion to disqualify that he had no independent recollection of being deposed. *See* Jt.App. at 163 n. 3. Even if he had been deposed, we are unconvinced that his limited involvement in the *L.Z.* case constitutes grounds for disqualification in the present case.

Plaintiffs raise two additional arguments on appeal, neither of which was raised before the district court, namely, that the court improperly restricted plaintiffs' experts to a verbatim reading of their written reports at trial and demonstrated hostility toward members of the class in its final order denying relief on the merits. *See* Appellant's Br. at 30–31. Because these issues were not raised before the district court, we decline to consider them here.

In sum, we find that the district court's rulings with respect to the above issues neither individually, nor in combination, denied plaintiffs' right to a fair trial.

## III.

On April, 26, 1994, the district court issued its Findings of Fact and Conclusions of Law denying plaintiffs relief on all of their court-tried claims for injunctive relief. *See* Jt.App. at 240. Pursuant to 42 U.S.C. § 1988 plaintiffs filed a motion for attorneys' fees and expenses in the sum of $327,009 and $42,214, respectively. Following the Supreme Court's holding in *Farrar v. Hobby,* —— U.S.

——, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), the court held that A.J.'s award of $42 in damages for his unlawful placement in isolation was more than a technical victory and, as such, entitled plaintiffs to attorneys' fees. Jt.App. at 972. In considering the proper amount of fees to award, the court noted that plaintiffs sought an unspecified amount of damages as well as injunctive relief and only received nominal damages of $42. Accordingly, it declined to award the full amount of fees requested by plaintiffs. Further, consistent with its January 22, 1990, order granting Mr. Lambert's *pro hac vice* motion, in which the court stated that attorneys' fees, if assessed, would only be paid to one attorney, the court concluded that only one of several attorneys who represented plaintiffs would be awarded fees. *Id.* at 974. Accordingly, the court awarded fees only to Veronica Johnson, who requested $8,428 for her work on A.J.'s jury claim. In addition, it awarded $16,000 for her work on the class claims since "information garnered there was necessarily required for aspects of the jury case," *id.* at 975, thus bringing Johnson's total fee award to $24,428. The court additionally awarded Johnson $4,797 for costs. The district court declined to award attorneys' fees for the class's claims for injunctive relief on the basis that plaintiffs' suit did not prompt the corrective action taken by defendants with respect to the practices and conditions challenged by plaintiffs. *Id.* at 973 n. 3.

Plaintiffs argue that the court erred in limiting attorneys' fees to only one of plaintiffs' counsel on A.J.'s jury claim [16] and in holding that the class did not "prevail" under section 1988 on its claims for injunctive relief.

### A. Fee Award for A.J.'s Jury Claim

 As an initial matter, we agree with the district court that the jury's finding in favor of A.J. on his isolation claim "indeed [is] a significant issue" entitling plaintiffs to attorneys' fees. *See id.* at 972; *Farrar,* —— U.S. at ——, 113 S.Ct. at 578 (O'Connor, J.,

concurring). We cannot agree with the court's view, however, that this litigation "was not so complex as to require the efforts of more than one attorney." Jt.App. at 974. Pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988(b), prevailing parties are entitled to reasonable attorneys' fees as part of the costs of their case.[17] A prevailing party should ordinarily recover attorneys' fees under section 1988 unless special circumstances would render such an award unjust. *Hatfield v. Hayes,* 877 F.2d 717, 719 (8th Cir.1989) (citing *Newman v. Piggie Park Enter., Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968)). "Appellate review of a denial of attorney's fees under § 1988 is governed by the abuse of discretion standard, but a district court's discretion in denying attorney's fees to prevailing parties is narrow." *Id.*

The district court abused its discretion, we believe, in limiting attorneys' fees to only one attorney. Nothing in the record persuades us that plaintiffs' suit was so rudimentary as to require the labor and expertise of only one attorney. Even if their suit were uncomplicated, which we believe it was not, this fact alone would not constitute a "special circumstance" justifying the denial of attorneys' fees to all but one of plaintiffs' attorneys. *See Staten v. Housing Auth.,* 638 F.2d 599, 605 (3rd Cir.1980) (the fact that a case was "simple" or could be "handled routinely" does not justify denial of attorney's fees in § 1983 cases); *Hatfield,* 877 F.2d at 720 (citing *Staten,* 638 F.2d at 605).

 Additionally, we find no legal basis for either the court's initial order or its ultimate decision limiting fees to one attorney. The use of more than one attorney in multiple party litigation has been recognized by courts, including our own, as both desirable and common.

> [W]here more than one attorney represents the prevailing party, the contribution

---

**16.** Neither plaintiffs nor defendants challenge the reasonableness of the fees awarded to Veronica Johnson. That award is thus final.

**17.** A reasonable fee under section 1988 "is properly calculated by multiplying the number of hours reasonably expended on the litigation

times a reasonable hourly rate." *Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983)).

of all attorneys must be taken into consideration and the fees awarded should reflect the efforts of all, at least to the extent that the time reported does not reflect duplication of effort or work that would be performed by nonlawyers. *Reynolds v. Coomey*, 567 F.2d 1166, 1167 (1st Cir.1978); *see also Berberena v. Coler*, 753 F.2d 629, 633 (7th Cir.1985); *Catlett v. Missouri Highway & Transp. Comm'n*, 828 F.2d 1260, 1271 (8th Cir.1987); *Davis v. City and County of San Francisco*, 976 F.2d 1536, 1544 (9th Cir.1992); *Johnson v. University College*, 706 F.2d 1205, 1208 (11th Cir.), *cert. denied*, 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983). A court may reduce attorney hours, and consequently fees, for inefficiency or duplication of services in cases where more than one attorney is used. *Johnson*, 706 F.2d at 1208. We are not aware of any cases, however, which hold that a court may reduce attorneys' fees *solely* on the basis that multiple attorneys helped to secure a prevailing party's success. In deciding the proper amount of fees to award, the court did not review plaintiffs' fee request to determine whether the work of three attorneys [18] who expended considerable time and effort on A.J.'s jury claim improperly duplicated the work of Ms. Johnson. The court, rather, simply relied on its January 1990 order in which it, without explanation or the benefit of having heard any evidence, announced that it would consider awarding fees to only one of plaintiffs' attorneys.[19]

Although we hesitate to speculate whether the court had other reasons for denying attorneys' fees to all but one of plaintiffs' counsel, the court's animosity toward Mr. Lambert, *see supra*, is perhaps indicative of the court's posture toward plaintiffs here generally. At a September 1991 status hearing the court told Lambert:

> You are wanting to raise money for your center out in San Francisco and that's the only reason you are here, in my opinion. I have told you before I am not going to pay your fee regardless of how successful you are because of my order that we are going to pay fees of one attorney. You are merely here to generate money. . . .

*Id.* at 121. Unfounded allegations about an attorney plainly cannot serve as a basis for denying attorneys' fees under section 1988. Nor is it appropriate for a court to decline fees because an attorney is employed by a legal aid organization, which the National Center for Youth Law, the organization with which Mr. Lambert is affiliated, clearly is. *See Oldham v. Ehrlich*, 617 F.2d 163, 168 (8th Cir.1980); *Reynolds*, 567 F.2d at 1167.

18. In addition to Ms. Johnson, plaintiffs were represented by two attorneys from the Kansas City law firm of Arthur Benson & Associates (the same firm in which Johnson was an associate). Arthur Benson was lead counsel for A.J.'s two-day jury trial. He selected the jury, made opening remarks, conducted direct examination for three of four of plaintiffs' witnesses, and cross-examined all of the defense's witnesses. Jamie Lansford, an associate of Benson's and specialist on matters relating to jury instructions, researched and drafted jury instructions. Mr. Benson and Ms. Lansford were assisted by David Lambert, a staff attorney at the National Center for Youth Law in San Francisco, who was asked to participate in this litigation because of his extensive knowledge of juveniles' conditions of confinement. Appellant's Attorney's Fees Br. at 13; *see also* Jt.App. at 683, 821–824, 827–828, 830–831.

19. The court stated in its order that

counsel should be aware of certain restrictions which will be applied here. First, if any counsel for the plaintiff contemplates applying for attorney fees to be paid by defendant, the Court will consider application for one of plaintiff's local counsel who is a member of the United States District Court Bar for the Western District of Missouri. If more than one attorney anticipates applying for an award of attorney fees in this case, he or she must demonstrate more than one attorney is necessary to prosecute this case with expectation of court awarded attorney fees.

Jt.App. at 651. Relying on the last sentence, defendants argue that plaintiffs' counsel never demonstrated that the work of more than one attorney was necessary. Attorney's Fee Br. of Appellees' Kierst, Morrison and Williams at 7. We reject this argument. In response to the court's order plaintiffs' filed a memorandum (to which the court did not respond) stating that they fully intended to seek an award of fees pursuant to 42 U.S.C. § 1988 in the event they were prevailing parties. Plaintiffs adequately explained in their memorandum why more than one attorney was necessary for the preparation and presentation of their claims. *See* Memorandum Response of Plaintiffs to the Court's Order of January 22, 1990, Feb. 9, 1990, at 2–3.

In sum, we conclude that the district court erred in limiting attorneys' fees to only one of plaintiffs' attorneys on A.J.'s successful jury claim. We therefore reverse the court's September 29, 1994, order to the extent it denies fees to counsel who assisted in the preparation and presentation of A.J.'s jury claim and direct the court to award reasonable fees and costs to all attorneys who worked on A.J.'s claim. In addition to considering work directly related to A.J.'s jury claim, the court should consider, as it did with Ms. Johnson, the interrelatedness of A.J.'s claims and those of the class. Counsel should be compensated for time attributable to the class's claims which resulted in the production of information required to litigate A.J.'s jury claim.

### B. *Fee Award for the Class's Claims*

 Relying on the so-called "catalyst theory," plaintiffs argue that the district court erred in holding that plaintiffs did not "prevail" on their claims for injunctive relief since their lawsuit prompted remedial action by defendants that was directly responsive to plaintiffs' concerns. The district court addressed this issue cursorily, stating only that the "catalyst theory" did not apply because plaintiffs' suit was not responsible for the remedial action taken by defendants and because the complained of conditions did not amount to constitutional violations. *See* Jt. App. at 973 n. 3.

 Our circuit, as well as virtually every other, *see Baumgartner v. Harrisburg Housing Auth.*, 21 F.3d 541, 545 n. 3 (3rd Cir. 1994) (cataloging "catalyst theory" cases), has recognized that when remedial action by a defendant moots the lawsuit before trial, a party is entitled to prevailing party status if his lawsuit was a catalyst that brought about or prompted the defendant's remedial action. *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist., No. 1*, 17 F.3d 260, 263 (8th Cir.1994); *Goodro v. Bowen*, 854 F.2d 313, 314 (8th Cir.1988); *Truax v. Bowen*, 842 F.2d 995, 997 (8th Cir.1988); *Williams v. Miller*, 620 F.2d 199, 202 (8th Cir.1980) (per curiam). Plaintiffs, thus, may "prevail" under section 1988 if they " 'succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit[,]' " *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983) (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978)), despite the absence of a formal judgment in their favor. *See Hewitt v. Helms*, 482 U.S. 755, 760, 107 S.Ct. 2672, 2676, 96 L.Ed.2d 654 (1987) ("It is settled law ... that relief need not be judicially decreed in order to justify a fee award under § 1988."). A party, however, who litigates to judgment and loses on all of his claims cannot be said to have "prevailed." *Id.* at 763, 107 S.Ct. at 2677; *see also Farrar*, — U.S. at —, 113 S.Ct. at 573 ("[T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim.")

Even crediting plaintiffs with having prompted some of the corrective action taken by defendants, we cannot in accordance with the above law find that plaintiffs were prevailing parties. The district court ruled against plaintiffs on several of their claims for injunctive relief on summary judgment and against them on all remaining claims at trial. Accordingly, we hold that the court did not err in denying plaintiffs attorneys' fees for their work on the class's claims for injunctive relief.

Because we conclude that the court erred in awarding attorney's fees to only one of plaintiffs' counsel on A.J.'s successful jury claim, we reverse the court's order to the extent it denies fees to co-counsel and remand with directions to determine the appropriate award of fees and costs consistent with our instructions and the proper legal guidelines.