In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 18-1429 & 18-1438

LAERA D. REED and PAIGE RAY-CLUNEY,

*Plaintiffs-Appellants*,

*v.*

CHARLES PALMER,

*Defendant-Appellee*.

Appeals from the United States District Court for the
Western District of Wisconsin.
Nos. 17-cv-590 & 17-cv-591 — **Barbara B. Crabb**, *Judge*.

ARGUED SEPTEMBER 13, 2018 — DECIDED OCTOBER 9, 2018

Before FLAUM, MANION, and ROVNER, *Circuit Judges*.

FLAUM, *Circuit Judge*. The State of Iowa declared Laera
Reed and Paige Ray-Cluney delinquent youths and sent them
to a juvenile institution in Wisconsin. Plaintiffs filed suit un-
der 42 U.S.C. § 1983 against multiple Wisconsin officials and
Charles Palmer, the Director of the Iowa Department of Hu-
man Services, alleging they suffered from the excessive use of
isolation cells and excessive force. A district court in the West-
ern District of Wisconsin dismissed plaintiffs' claims against

Palmer at the pleading stage on the basis of qualified immunity, and plaintiffs now appeal. For the reasons below, we reverse.

## I. Background

### A. Factual Background

In January 2014, the State of Iowa closed the Iowa Girls State Training School in Toledo, Iowa. Defendant Charles Palmer, Director of the Iowa Department of Human Services, subsequently contracted with the State of Wisconsin to use the Wisconsin Girls State Training School (also known as "Copper Lake") in Irma, Wisconsin. Under the terms of the agreement, Iowa agreed to pay Wisconsin $301 per day for each child.

According to plaintiffs, Copper Lake comes with a disreputable history. They claim that, since its opening in 2011, it "has had a very high turnover rate of employees," leading to "over worked and untrained staff." They further assert that between 2012 and 2016, the facility received criticism from multiple Wisconsin circuit court judges regarding its "sordid" and "inhumane" treatment of juveniles. Plaintiffs claim a state criminal probe into Copper Lake began in 2015.

Iowa juvenile courts ordered plaintiffs Paige Ray-Cluney and Laura Reed to be placed at Copper Lake on March 10 and June 4, 2015, respectively. At the time, both girls were sixteen years old. Plaintiffs claim that during their stays, Copper Lake staff subjected them to prolonged periods of "isolation,"[1]

---

[1] Specifically, plaintiffs allege that Reed spent at least thirty-four days in isolation between August and October 2015, and another thirty to forty days in isolation between November 2015 and February 2016. They allege Ray-Cluney spent at least four weeks in isolation between June 29 and

which involved spending approximately twenty-two out of twenty-four hours each day in a seven-foot by ten-foot concrete cell furnished with only a metal cot and a thin mattress. They allege these isolation cells had urine stains on the floor and wall, and only one window "covered by a thick cage reducing light that [could] pass through." They claim that during their limited periods of release, they were only allowed to "shower, clean [their] room[s], receive 15 minutes to exercise, receive 10-15 minutes to write a letter, and use the restroom." If any time remained, they were required to sit in chairs by themselves and were "not allowed to speak." They allege they were not released from isolation for meals and received little or no educational instruction. Both plaintiffs attempted suicide.

In addition to solitary confinement, plaintiffs also claim they were subjected to excessive force. Reed alleges that, during one of her periods of isolation, a security guard pulled her "fingers through the food tray slot in the cell door," causing "scrapes and bleeding." She further asserts that, on an occasion when she attempted self-harm by placing her head underneath her cot, the same security guard stood on top of the cot in order to tighten it against her neck. She also alleges the security guard "slammed her against [her] cell wall with such force as to leave a contusion on her head and a laceration on her lips." Meanwhile, Ray-Cluney alleges she was "placed in restraints so tight that they left her arm purple" and "had her

September 14, 2015, and all but three days in isolation between September 14 and December 15, 2015. Overall, Reed believes she was held in isolation for over two months and Ray-Cluney asserts she was in isolation for over five months.

head rammed against the wall of the cell." Finally, both plaintiffs claim Copper Lake staff sprayed them with mace on multiple occasions.

### B. Procedural Background

Plaintiffs separately filed suit in the Western District of Wisconsin on August 1, 2017. They each asserted violations of the Fourth, Eighth, and Fourteenth Amendments under 42 U.S.C. § 1983 for cruel and unusual punishment, excessive force, and deprivation of due process. They additionally brought common law claims for intentional infliction of emotional distress and negligence. Finally, Reed alleged multiple violations of the Iowa state constitution.

The named defendants in both cases were almost entirely Wisconsin officials associated with Copper Lake.[2] The lone exception was Palmer. According to the complaints in each case: the state of Iowa, by and through Palmer, contracted with the state of Wisconsin to use the Copper Lake facility; Palmer had custody of both plaintiffs in June 2015 pursuant to court orders; the State of Iowa, by and through Palmer, "monitored and received reports concerning [plaintiffs'] confinement at Copper Lake"; and Palmer knew or should have known of Copper Lake's use of isolation cells and, despite this knowledge, failed to remove the Iowa girls, failed to ensure

---

[2] These defendants included Copper Lake's current and former Superintendent, Deputy Superintendent, Director of Security, Corrections Unit Supervisor, and security guards, as well as the Wisconsin Administrator of Juvenile Corrections.

Copper Lake's staff were properly trained and supervised, and acted with deliberate indifference in doing so.[3]

Palmer moved to dismiss the claims against him in both cases. He raised multiple legal objections, including: (1) lack of personal jurisdiction; (2) *forum non conveniens*; (3) Eleventh Amendment immunity; (4) failure to state a claim upon which relief may be granted; (5) absolute immunity; (6) qualified immunity; (7) lack of personal responsibility; and (8) failure to exhaust administrative remedies related to the tort claims. Palmer also argued that the district court should abstain from determining the contours of the state constitutional claims raised in Reed's complaint.

The district court concluded that it "need not address" Palmer's personal jurisdiction defense because it could "resolv[e] the suit on the merits." Specifically, the court found that no law clearly established "what the [C]onstitution requires of a government official in [Palmer's] position under similar circumstances." As a result, the court held qualified immunity barred plaintiffs' federal constitutional claims. The court further dismissed plaintiffs' common law claims for failure to exhaust administrative remedies and declined to exercise supplemental jurisdiction over the remaining state constitutional claims.[4] This appeal followed.[5]

_____

[3] Plaintiffs do not allege that Palmer had any knowledge of Copper Lake's use of excessive force.

[4] Plaintiffs do not challenge this aspect of the district court's ruling, and they have filed a complaint in Iowa state court asserting all of their state law claims.

[5] The district court entered a partial judgment in favor of Palmer pursuant to Federal Rule of Civil Procedure 54(b). *See* Fed. R. Civ. P. 54(b)

## II. Discussion

### A. Qualified Immunity

We review the district court's qualified immunity analysis on a Rule 12(b)(6) motion de novo. *Ewell v. Toney*, 853 F.3d 911, 918 (7th Cir. 2017). In doing so, "we consider the facts, including all reasonable inferences from them, in the light most favorable to the nonmoving party." *Id.* at 918–19.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "The defense provides 'ample room for mistaken judgments' and protects all but the 'plainly incompetent and those who knowingly violate the law.'" *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017) (quoting *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008)).

"A state official is protected by qualified immunity unless the plaintiff shows: '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Kemp v. Liebel*,

---

("[W]hen multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, … parties … if the court expressly determines that there is no just reason for delay."). Plaintiffs' claims against the Wisconsin defendants remain pending.

877 F.3d 346, 350–51 (7th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "If *either* inquiry is answered in the negative, the defendant official" is protected by qualified immunity. *Green*, 868 F.3d at 633 (quoting *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014)). "In order to avoid '[u]nnecessary litigation of constitutional issues' and expending scarce judicial resources that ultimately do not impact the outcome of the case," courts "may analyze the 'clearly established' prong without first considering whether the alleged constitutional right was violated." *Kemp*, 877 F.3d at 351 (alteration in original) (quoting *Pearson*, 555 U.S. at 236–37). The district court adopted that approach here.

Under the clearly established prong, "the burden is on plaintiffs to demonstrate the alleged violation of their [constitutional] right[s] was 'clearly established.'" *Id.* "To be clearly established at the time of the challenged conduct, the right's contours must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right … ." *Id.* (alteration in original) (quoting *Gustafson v. Adkins*, 803 F.3d 883, 891 (7th Cir. 2015)). "[T]he crucial question [is] whether the official acted reasonably in the *particular circumstances* that he or she faced." *Id.* (alterations in original) (emphasis added) (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).

Ordinarily, to show that the law was "clearly established," plaintiffs must point to a "closely analogous case" finding the alleged violation unlawful. *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013). They need not point to an identical case, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *al-Kidd*, 563 U.S. at

741); *see also Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) ("The law is 'clearly established' when 'various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand.'" (quoting *Campbell v. Peters*, 256 F.3d 695, 701 (7th Cir. 2001))). "[W]e look first to controlling Supreme Court precedent and our own circuit decisions on the issue." *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000). If no controlling precedent exists, "we broaden our survey to include all relevant caselaw in order to determine 'whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Id.* (quoting *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989)); *see also al-Kidd*, 563 U.S. at 742 (requiring a "robust 'consensus of cases of persuasive authority'" (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999))).

Alternatively, "[i]n some rare cases, where the constitutional violation is patently obvious, the plaintiffs may not be required to present the court with any analogous cases." *Jacobs*, 215 F.3d at 767. Instead, plaintiffs can demonstrate clearly established law by proving the defendant's conduct was "so egregious and unreasonable that … no reasonable [official] could have thought he was acting lawfully." *Abbott v. Sangamon County*, 705 F.3d 706, 724 (7th Cir. 2013). Outrageous conduct "obviously will be unconstitutional." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S 364, 377 (2009). "But even as to action less than an outrage, 'officials can still be on notice that their conduct violates established law … in novel factual circumstances.'" *Id.* at 377–78 (alteration in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Importantly, "[b]efore we can determine if the law was clearly established, 'the right allegedly violated must be defined at the appropriate level of specificity.'" *Kemp*, 877 F.3d at 351 (quoting *Wilson*, 526 U.S. at 615). "The Supreme Court has 'repeatedly told courts … not to define clearly established law at a high level of generality.'" *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013) (alteration in original) (quoting *al-Kidd*, 563 U.S. at 742); *see, e.g.*, *Kiesla v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam); *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam); *Mullenix*, 136 S. Ct. at 308; *Plumhoff*, 134 S. Ct. at 2023. Instead, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742). In other words, "the clearly established law must be 'particularized' to the facts of the case." *White*, 137 S. Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Volkman*, 736 F.3d at 1090 ("[T]he Seventh Circuit has long held that 'the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted.'" (quoting *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987))).

## B. Qualified Immunity Defenses at the Rule 12(b)(6) Stage

Because a qualified immunity defense so closely depends "on the facts of the case," a "complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds." *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001). "A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v.*

*City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). These sources rarely develop a robust factual record, given that, at the pleading stage, a plaintiff need only "state a claim to relief that is plausible on its face." *Archer v. Chisholm*, 870 F.3d 603, 612 (7th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To state a "plausible" claim, a plaintiff need not include every detail or fact related to the basis of her allegations. Rather, she only needs to include "enough details about the subject-matter of the case to present a story that holds together." *Catinella v. County of Cook*, 881 F.3d 514, 516 (7th Cir. 2018) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)).

The plausibility standard creates tension at this stage of litigation between developing the requisite facts for a well-informed qualified immunity determination and preserving a government official's right to avoid the burdens of pretrial matters, including discovery. *See Behrens v. Pelletier*, 516 U.S. 299, 308 (1996). We have recognized that tension, noting:

> [I]t appears that in some cases, a complaint may be dismissed under Rule 12(b)(6) on qualified immunity grounds .… In that case, while the plaintiff may have stated a claim, it is not one "upon which relief can be granted" and a court may properly address this purely legal question under Rule 12(b)(6). However, in many cases, the existence of qualified immunity will depend on the particular facts of a given case. In those cases, the plaintiff is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity . … The district court then has a variety of means at

its disposal to move the case incrementally forward in order to address the qualified immunity issue at the earliest possible stage, so that a defendant who is immune from suit is not put through the time, effort and expense of defending himself against a claim upon which, ultimately, no relief can be granted.

*Jacobs*, 215 F.3d at 765 n.3 (citations omitted); *see also id.* at 775 (Easterbrook, J., concurring in part and concurring in the judgment) ("Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal."). Other circuits have made similar observations. *See, e.g.*, *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015); *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014); *Owens v. Balt. City State's Attorneys Office*, 767 F.3d 379, 396 (4th Cir. 2014); *Barnett v. Mount Vernon Police Dep't*, 523 F. App'x 811, 813 (2d Cir. 2013); *Thomas v. Independence Township*, 463 F.3d 285, 299 (3d Cir. 2006); *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001).

In short, "[a]sserting a qualified immunity defense via a Rule 12(b)(6) motion … subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Thomas*, 765 F.3d at 1194 (quoting *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004)). Under the former, "it is the defendant's conduct *as alleged in the complaint* that is scrutinized for 'objective legal reasonableness.'" *Behrens*, 516 U.S. at 309. Under the latter, "the plaintiff can no longer rest on the pleadings, and the court looks to the evidence before it (in the light most favorable to the plaintiff) when conducting the [qualified immunity] inquiry." *Id.* (citation omitted).

### C. Palmer's Qualified Immunity Defense

Given this backdrop, the district court acted prematurely in deciding Palmer's entitlement to qualified immunity at the motion to dismiss stage. The court found that, during the time period alleged in the complaints, no law clearly established "what the [C]onstitution requires of a government official in [Palmer's] position under similar circumstances."

Palmer's position is determined with reference to the well-pleaded factual allegations in plaintiffs' complaints, which are taken as true and considered in the light most favorable to plaintiffs on a Rule 12(b)(6) motion to dismiss. *See Ewell*, 853 F.3d at 918–19. According to the complaints, Palmer contracted with the state of Wisconsin to place juveniles, including plaintiffs, in the Copper Lake facility. The complaints further allege that both plaintiffs were in Palmer's custody pursuant to state court orders. Moreover, Palmer monitored and received reports concerning Reed's and Ray-Cluney's conditions of confinement at Copper Lake. Based on these reports, plaintiffs allege Palmer "knew or should have known of the systemic and excessive use of isolation cells at Copper Lake," and "[d]espite such knowledge, Palmer failed to remove the Iowa girls placed at Copper Lake and acted with deliberate indifference in doing so." These allegations are sufficient to withstand a Rule 12(b)(6) motion to dismiss.

Plaintiffs have sufficiently alleged that their constitutional rights were violated through excessive use of isolation cells at Copper Lake. Supreme Court precedent is not clear about whether state juvenile detention facility conditions should be judged under the Eighth Amendment's Cruel and Unusual Punishment Clause or the Fourteenth Amendment's Due Process Clause. *See Gary H. v. Hegstrom*, 831 F.2d 1430, 1431–32

(9th Cir. 1987) ("The Supreme Court has not announced the appropriate federal standards by which to judge state juvenile detention facility conditions."); *Santana v. Collazo*, 714 F.2d 1172, 1179 (1st Cir. 1983) (same). Indeed, the Court expressly avoided deciding this question in *Ingraham v. Wright*, 430 U.S. 651, 669 n.37 (1977).

In a case over forty years ago, we applied the Eighth Amendment's cruel and unusual punishment standard to evaluate the use of corporal punishment and tranquilizing drugs at a juvenile correctional institution. *See Nelson v. Heyne*, 491 F.2d 352, 354–57 (7th Cir. 1974). Under that test, a prison's deprivation must be an "objectively, 'sufficiently serious' … denial of 'the minimal civilized measure of life's necessities,'" and the state actor "must have a 'sufficiently culpable state of mind.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted). Using this standard, a district court recently held, in the context of a preliminary injunction motion, that juvenile isolation is likely unconstitutional. *See V.W. ex rel. Williams v. Conway*, 236 F. Supp. 3d 554, 584 (N.D.N.Y. 2017) ("[T]he use of disciplinary confinement on juveniles [was] not *reasonably* calculated to restore prison safety and, even when it [was], disciplinary isolation at the [detention center] continue[d] long after any safety concerns had been abated.").

Meanwhile, other circuits have applied the Fourteenth Amendment's "more protective" Due Process Clause in evaluating juvenile detention center conditions. *Gary H.*, 831 F.2d at 1432 (evaluating management of facility for adolescent wards of the juvenile court); *see also A.J. ex rel. L.B. v. Kierst*, 56 F.3d 849, 854 (8th Cir. 1995) (juvenile pretrial detainees); *H.C. v. Jarrard*, 786 F.2d 1080, 1084–85 (11th Cir. 1986) (same); *Santana*, 714 F.2d at 1179–81 (juvenile residents of industrial

school); *Milonas v. Williams*, 691 F.2d 931, 942 & n.10 (10th Cir. 1982) (private school for juvenile boys with behavioral and mental health problems). This standard is more protective in that "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." *Ingraham*, 430 U.S. at 671 n.40. "Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." *Id.*

To determine "the constitutionality of conditions or restrictions of pretrial detention" using a Fourteenth Amendment due process inquiry, courts must first evaluate "whether those conditions amount to punishment of the detainee," because "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Still, "restrictions on liberty" are permissible so long as they are "reasonably related to legitimate government objectives and not tantamount to punishment." *Youngberg v. Romeo*, 457 U.S. 307, 320 (1982); *see also Bell*, 441 U.S. at 538 ("A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose."). To make this determination, courts "weigh[] the individual's interest in liberty against the State's asserted reasons" for their restraint. *Youngberg*, 457 U.S. at 320.

At the time plaintiffs were allegedly in Palmer's custody, isolation of pre-trial juvenile detainees not "reasonably related to a legitimate governmental objective," *Bell*, 441 U.S. at 539, could rise to the level of a constitutional violation. Here, plaintiffs' complaints plausibly allege that they were kept in

isolation at Copper Lake for excessive amounts of time. Caselaw clearly establishes that such conduct could violate the Fourteenth and/or the Eighth Amendment.

On the present record, however, it is impossible to determine whether such a constitutional violation occurred in plaintiffs' cases. We know the respective complaints allege plaintiffs spent an inordinate amount of time at Copper Lake in isolation. However, we do not know the reasons behind their seclusion. We therefore cannot evaluate, under the Fourteenth Amendment, whether Palmer—or the other defendants—acted reasonably pursuant to a "legitimate governmental objective" or instead unlawfully "punished" plaintiffs. *See Bell*, 441 U.S. at 535, 539. Nor can we determine, under the Eighth Amendment, whether Palmer had a "sufficiently culpable state of mind." *See Farmer*, 511 U.S. at 834. In sum, as one district court recently concluded in denying a motion to dismiss Eighth and Fourteenth Amendment claims arising from a plaintiff's isolated confinement at an Iowa juvenile home:

> Whether the alleged actions herein were "reasonably related to a legitimate institutional interest," or were for the "legitimate purpose" of containing Plaintiff's violent behavior, *requires a factual inquiry that cannot be accomplished at this stage of proceedings* so long as Plaintiff has alleged facts that generate a plausible claim. Taking the complaint in its entirety, Defendants' current legal arguments [did] not render implausible the allegations in the complaint. Additionally, … even if a legitimate purpose for isolating a detainee is provided, a due process

> violation may still occur if the conditions imposed are excessive in relation to the nonpunitive purpose, *a further factual inquiry* …. Accordingly, Defendants have not shown that they are entitled to qualified immunity on the face of the compliant.

*Turner v. Palmer*, 84 F. Supp. 3d 880, 883–84 (S.D. Iowa 2015) (emphasis added) (citation omitted). The same reasoning applies here. Plaintiffs have plausibly alleged their constitutional rights were violated at Copper Lake when they were placed in isolation "without justification." On the face of plaintiffs' complaints alone, Palmer has not shown he is entitled to qualified immunity.

This case involves the added wrinkle that plaintiffs were housed in Wisconsin, not in Iowa. In other words, Palmer was not one of the Copper Lake officials placing plaintiffs in isolation. Rather, plaintiffs allege Palmer only contracted with Wisconsin to send juveniles to Copper Lake and later "received" and "monitored" reports regarding the juveniles sent there. According to the district court, this made the claims against Palmer "completely different" from other cases where the defendants "actually controlled and operated the institution in which the abuse had occurred and 'oversaw the use of the isolation cells in which [the] plaintiff was confined.'" (alteration in original) (quoting *Turner*, 84 F. Supp. 3d at 882). In the district court's view, no law clearly establishes what the Constitution requires of an official in Palmer's unique posture.

Palmer's additional degree of separation is a distinguishing feature of this litigation, but at the motion to dismiss stage, our conclusion does not change. Under *DeShaney v. Winnebago*

*County Department of Social Services*, it is clearly established that the Due Process Clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,'" but does not "impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." 489 U.S. 189, 195 (1989). It is equally established, however, that an exception to the *DeShaney* principle arises "if the state has a 'special relationship' with a person, that is, if the state has custody of a person, thus cutting off alternate avenues of aid." *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998). In such cases, the State "assumes at least a rudimentary duty of safekeeping." *Hutchinson ex rel. Baker v. Spink*, 126 F.3d 895, 900 (7th Cir. 1997).

On multiple occasions, we have applied the "special relationship" exception to cases where "the State removes a child from her natural parents." *Id.*; *see also Camp v. Gregory*, 67 F.3d 1286, 1296–98 (7th Cir. 1995); *K.H. v. Morgan*, 914 F.2d 846, 849 (7th Cir. 1990). Thus, "once a state removes a child from her parents' custody," it "assumes a duty of safekeeping" due to the restraints it places on the liberty of the child. *Berman v. Young*, 291 F.3d 976, 982 (7th Cir. 2002), *as amended on denial of reh'g* (June 26, 2002). Such a duty is violated when the State "place[s] a child in custody with foster parents it knows are incompetent or dangerous." *Hutchinson*, 126 F.3d at 900; *see also Waubanascum v. Shawano County*, 416 F.3d 658, 665 (7th Cir. 2005).

This case differs from *Berman* and *Waubanascum*; plaintiffs were placed at an out-of-state institution, not a private foster care home. Nevertheless, in *K.H.*, we defined the relevant constitutional right as "the right of a child in state custody not to

be handed over by state officers to a foster parent *or other custodian, private or public* whom the state knows or suspects to be a child abuser." 914 F.2d at 852 (emphasis added and then removed); *see also id.* at 851 ("[T]he Constitution requires the responsible state officials to take steps to prevent *children in state institutions* from deteriorating physically or psychologically." (emphasis added)). This language encompasses Palmer's alleged role here.[6] Allegations against Palmer are

---

[6] The D.C. Circuit's decision in *Smith v. District of Columbia*, 413 F.3d 86 (D.C. Cir. 2005), reinforces this conclusion. There, the District of Columbia placed delinquent youths in so-called "independent living programs" run by private companies: such placements were made, and could only be changed by, court order. *Id.* at 89, 91. One such youth placed in this program was murdered while living at his assigned apartment. *Id.* at 90. The deceased's grandmother filed due process claims against not only the private apartment complex and the independent living program, but also the District. *Id.* The District argued it was not liable because the deceased could not "meaningfully be said to have been in the District's custody when he was murdered" given this contractual relationship with the private company housing the deceased. *Id.* at 94. The D.C. Circuit disagreed: "[T]he District's *legal* custody over [the deceased was] a good indicator that it had a duty to look after him." *Id.* (emphasis added). It analogized the case to decisions "holding that children in foster care are in state custody for substantive due process purposes and … that in placing them in foster homes and monitoring their progress, the state owes them a constitutional duty of care." *Id.* at 95 (collecting cases). According to the court, "[l]ike such children, [the deceased] not only looked to the government as primary guardian of his needs, but, absent District approval, also lacked freedom to seek alternate arrangements—precisely the two circumstances courts have found create … custody in the foster care situation." *Id.*

This case closely resembles *Smith*. Just as the District retained legal custody of the deceased in *Smith*, plaintiffs here allege that Palmer and the Iowa Department of Human Services retained legal custody for their wellbeing. Although Palmer argues that plaintiffs' placement was technically made—and controlled—by judicial rather than executive order, that same

not limited to his role in signing the contract that led to plaintiffs' placement at Copper Lake: Plaintiffs further allege that Palmer retained custody and received reports detailing their excessive isolation, yet took no steps to remove them from the facility and was deliberately indifferent in doing so.

The district court critiqued plaintiffs' failure to "provide any details" about the reports Palmer allegedly received or what his alleged monitoring entailed. However, as noted above, plaintiffs do not need to provide such details to cross the "plausibility" threshold at this stage: they need only include enough facts in their complaint "to present a story that holds together." *Catinella*, 881 F.3d at 516 (quoting *Swanson* 614 F.3d at 404); *see also Archer*, 870 F.3d at 612 ("A claim has the requisite plausibility [to survive a motion to dismiss] 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009))). Construing the well-pleaded facts and reasonable inferences in plaintiffs' favor, as we must, it can be reasonably inferred that Palmer had custody of plaintiffs while they were at Copper Lake and that he had the knowledge, responsibility, and influence to request removal of plaintiffs from the facility.

Palmer's remaining objections are undermined by the preliminary stage of the proceedings. He argues, for example, that he "did not have direct custody of the Plaintiffs." But this is directly contradicted by plaintiffs' complaints, which state

---

fact did not prevent the *Smith* court from holding the District liable. Nor did the fact that the District contracted its day-to-day hands-on responsibilities to an outside entity, which is precisely what Palmer did here, change the court's decision.

they were both in "custody of … Palmer" during their time at Copper Lake. He further complains that plaintiffs "cannot show that … [he] actually knew either girl was at risk of harm at the time of her placement." Maybe so. At this juncture, however, we are tied to plaintiffs' well-pleaded allegations, which expressly allege that Palmer "knew or should have known of the systemic and excessive use of isolation cells."

Of course, the above discussion does not preclude Palmer from securing qualified immunity later.[7] It is entirely possible, for example, that plaintiffs did not endure the extent of isolation that they allege. It is equally feasible that such solitary confinement was ordered pursuant to a legitimate governmental objective, or that plaintiffs will be unable to marshal evidence to show that defendants' actions substantially departed from accepted standards. Plaintiffs might also overstate Palmer's true level of involvement or his actual or constructive knowledge of the allegedly unconstitutional activity. If so, the district court would possess the authority to revisit the issue. In the meantime, however, this case is one that would greatly benefit from a more robust record. In short, although qualified immunity defenses should be decided at "the earliest possible stage in litigation," *Hunter v. Bryant*, 502 U.S. 224, 227 (1991), the determination whether qualified immunity exists for Palmer depends on "particular facts" that are not yet in the record. *See Jacobs*, 215 F.3d at 765 n.3.

---

[7] It also does not preclude Palmer from reasserting any of his defenses that the district court declined to address on the initial motion to dismiss, including his personal jurisdiction defense. *Cf. Transamerica Ins. Co. v. South*, 125 F.3d 392, 399 (7th Cir. 1997) (failure of an appellee to raise on appeal all alternative grounds for affirming district court's decision does not operate as a waiver).

Such a result does not condemn the district court to unnecessary litigation or impede Palmer's potential right to be free from suit. The district court has "a variety of means … to move the case incrementally forward in order to address the qualified immunity issue at the earliest possible stage." *Id*. For instance, "[t]he Rule 12(e) motion for a more definite statement is perhaps the best procedural tool available to the defendant to obtain the factual basis underlying a plaintiff's claim for relief." *Thomas*, 463 F.3d at 301. Alternatively, if additional evidence is needed to develop the factual record, the district court may "limit the timing, sequence, frequency, and extent of that discovery under Rule 26." *Id.* And of course, defendants can move for summary judgment under Rule 56. *Id.*

### III. Conclusion

For the foregoing reasons, we REVERSE the judgment of the district court in favor of Palmer on plaintiffs' claims against him and REMAND for further proceedings consistent with this opinion.