In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 18-2672

TAPANGA HARDEMAN, *et al.*,

*Plaintiffs-Appellees*,

*v.*

SHERIFF MARK CURRAN, *et al.*,

*Defendants-Appellants*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17 C 8729 — **Sharon Johnson Coleman**, *Judge*.

———————————

ARGUED MARCH 25, 2019 — DECIDED AUGUST 12, 2019

———————————

Before WOOD, *Chief Judge*, and FLAUM and SYKES, *Circuit Judges*.

WOOD, *Chief Judge*. Water is vital for both health and sanitation. Dehydration affects practically every life function, including temperature regulation, digestion, brain function, toxin elimination, and oxygen distribution. See Jon Johnson, "Effects of having no water," MEDICAL NEWS TODAY, https://www.medicalnewstoday.com/articles/325174.php

(last visited July 19, 2019). After a few days, total deprivation of water can be fatal. *Id.* Basic sanitation is also essential.

The plaintiffs in this case, all pretrial detainees at the Lake County Adult Correctional Facility, allege that they were forced to learn this lesson the hard way. For approximately three days in 2017, the jail officials shut off all water in their jail without any warning. With no running water, the plaintiffs had only limited water that the defendants provided for their personal and sanitation uses. As a result, they became ill and feces built up and festered in the jails' toilets, attracting insects. When plaintiffs asked for more water, they were locked down in their cells as punishment. The pretrial detainees responded with this putative class action, in which they alleged that the defendants violated their Fourteenth Amendment due process rights. Defendants moved to dismiss on the ground of qualified immunity. The district court denied their motion, and this interlocutory appeal followed. We agree with the district court's decision and affirm.

**I**

Because this case comes to us as a motion to dismiss asserting qualified immunity, we accept all well pleaded factual allegations in the complaint as true and draw all reasonable inferences in the plaintiffs' favor. *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018).

Defendants Lake County Sheriff Mark Curran and Chief of Corrections David Wathen oversee the Lake County Adult Correctional Facility. (We refer to them, as well as the various yet-unnamed defendants, collectively as "Wathen.") At the time of these events, plaintiffs (all pretrial detainees) were housed there. On November 7, 2017, Wathen shut off the

water at the jail. He did not forewarn any of the detainees that this shutoff was going to happen. The complaint does not reveal why Wathen shut off the water, although he avers in his briefing that he did so in order to replace a water booster pump.

During the shutoff, the detainees were not totally without water. Wathen provided them with five bottles (of indeterminate size) of water per day for their personal use. These five bottles were all that the detainees were given to drink, brush their teeth, wash their hands and faces, and take medication. When individual detainees asked for more water, they were refused. If a person repeatedly asked for more water, he was put on lockdown.

Wathen also provided a barrel of water (again, of unclear size) to each communal area, called a pod, within the jail. The barrel of water in each pod was to be used for bathing, cleaning the pod's cells, and flushing toilets within the cells. But not all flushing: the detainees were instructed to flush only when feces were present. They were forbidden to flush at all during the night.

Unfortunately, these arrangements for flushing were a failure, in that they often did not clear the toilets. This led to feces and urine sitting in toilets throughout the jail for prolonged periods of time. This was no small issue, as the jail has a capacity of approximately 740 inmates. There were thus hundreds of toilets holding feces and urine. Unsurprisingly, the continuous presence of excrement produced a powerful and putrid smell. Insects were also attracted to the unflushed feces.

The plaintiffs and other detainees say that these conditions were disgusting and caused them tangible harm. They allege that they became "sick, sleep deprived, and agitated" because of the continuous presence of excrement in their cells; that they were not provided with enough water to take needed medications; and that the lack of drinking water and unsanitary conditions caused numerous ailments, including "dehydration, migraine headaches, sickness, dizziness, constipation, and general malaise." Three days later, on November 10, 2017, the water shutoff ended.

## II

Because this appeal comes to us after a denial of qualified immunity, we must answer two questions: first, whether the constitutional right asserted by the plaintiffs was clearly established at the time the defendants acted; and second, whether defendants' actions violated that clearly established right. *Reed*, 906 F.3d at 546. "'If *either* inquiry is answered in the negative, the defendant official' is protected by qualified immunity." *Id.* (quoting *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017)). Our review is *de novo*. *Id.*

When attempting to defeat an assertion of qualified immunity, the burden is on the plaintiffs to show that a particular right is "clearly established." To meet that burden, a plaintiff's asserted right must be defined "at the appropriate level of specificity." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). "The Supreme Court has 'repeatedly told lower courts … not to define clearly established law at a high level of generality.'" *Reed*, 906 F.3d at 548 (quoting *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013) (alteration in original)). An appropriately defined right is clearly established if there is a closely analogous—though not necessarily identical—case identifying that

right, or if "the defendant's conduct was 'so egregious and unreasonable that … no reasonable [official] could have thought he was acting lawfully.'" *Id.* (alteration in original) (quoting *Abbott v. Sangamon Cnty.*, 705 F.3d 706, 724 (7th Cir. 2013)). "The dispositive question 'is whether the violative nature of *particular* conduct is clearly established.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

A

Plaintiffs here focus on two conditions that they allege violated their clearly established rights: the denial of the minimal amount of water needed for necessary activities of life, and the deprivation of the basic sanitary measure of preventing the build-up of feces, which forced plaintiffs to be surrounded by their own and others' excrement. Both of these claims describe conditions of confinement that courts have long recognized as potential constitutional violations. It has been clearly established for decades that prisons must provide inmates with "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). We have interpreted this general statement as a requirement that prisons provide inmates with "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities." *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (quoting *Lewis v. Lane*, 816 F.2d 1165, 1171 (7th Cir. 1987)); see also *Woods v. Thieret*, 903 F.2d 1080, 1082 (7th Cir. 1990) ("Clearly, prison officials have a responsibility to provide inmates with a minima of food, shelter and basic necessities.").

Wathen argues that despite the generally well-established nature of these rights, the circumstances of this case—a non-total deprivation caused by a three-day planned water

shutdown—take us into novel territory. But what is so new about it? All but the most plainly incompetent jail officials would be aware that it is constitutionally unacceptable to fail to provide inmates with enough water for consumption and sanitation over a three-day period. Perhaps an official would be excused for miscalculating the amount of water needed *ex ante*, so long as he worked to fix the problem once it manifested. But that is not the case before us. According to plaintiffs' allegations, Wathen provided a limited amount of water, he and his staff were quickly made aware that more water was needed both for consumption and for sanitation, and they failed to provide any additional water. Indeed, plaintiffs allege that Wathen punished them for continued water requests.

The conditions that plaintiffs depict are very similar to those we have seen in previous cases, in both duration and severity. In *Woods v. Thieret*, we stated that an allegation of three days without food (more specifically, one full day without food, sandwiched between days without dinner or breakfast) stated a claim for a violation of the Eighth Amendment. 903 F.2d at 1082. In *Johnson v. Pelker*, 891 F.2d 136 (7th Cir. 1989), we reversed a grant of summary judgment for the defendants because "placing a prisoner in a cell for three days without running water and in which feces are smeared on the walls while ignoring his requests for cleaning supplies" could violate the Eighth Amendment. *Id.* at 139. Similarly, a number of our sister circuits have recognized that days-long deprivations of water and continued exposure to human excrement can violate the Eighth Amendment. See *DeSpain v. Uphoff*, 264 F.3d 965, 974–75 (10th Cir. 2001) (stating that "[e]xposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in *Farmer* [*v.*

*Brennan*, 511 U.S. 825 (1994),] and the more general standards of dignity embodied in the Eighth Amendment," and collecting cases with similar holdings from the Second, Fifth, Seventh, and Eighth Circuits dating back to 1972); *Dellis v. Corrections Corp. of Am.*, 257 F.3d 508, 512 (6th Cir. 2001) (holding that a plaintiff "given only two half pints of milk and one sixteen and one-half ounce bottle of water" over three days stated an Eighth Amendment claim); *Johnson v. Lewis*, 217 F.3d 726, 732 (9th Cir. 2000) (finding allegations of inadequate drinking water over four days, along with other deprivations, sufficient to state an Eighth Amendment claim).

We recently reaffirmed in *Budd v. Motley* that conditions-of-confinement cases often involve "a mutually enforcing effect that produces the deprivation of a single, identifiable human need." 711 F.3d 840, 843 (7th Cir. 2013) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)). That is the case here. Drawing reasonable inferences in plaintiffs' favor, as we must at this stage, problems caused by limited drinking water may have been exacerbated by the lack of water for sanitation and the consequent exposure to feces and insects. The rights that plaintiffs identify—to have enough water for drinking and sanitation, and not to be forced to live surrounded by their own and others' excrement—are thus clearly established.

B

Wathen argues that his motive for shutting off the water is important, but that is so only if there is a subjective element to the plaintiffs' case. As we now explain, that would be true if they were convicted prisoners, but it is not for pretrial detainees. Courts more commonly see suits of this nature brought by prisoners, whose rights are rooted in the Eighth Amendment's prohibition on cruel and unusual punishment.

Pretrial detainees are in a different position, because their de-
tention is unrelated to punishment. *Kingsley v. Hendrickson*,
135 S. Ct. 2466, 2475 (2015). Pretrial detainees may assert a
conditions-of-confinement claim under the Fourteenth
Amendment's Due Process Clause. *Id.* at 2473.

For many years, we analyzed pre-conviction Fourteenth
Amendment and post-conviction Eighth Amendment
conditions-of-confinement claims under the same standard:
that of the Eighth Amendment, which has both a subjective
and an objective component. *Farmer*, 511 U.S. at 834. On the
subjective side, we asked in both types of cases whether the
defendant was deliberately indifferent "to adverse conditions
that deny 'the minimal civilized measure of life's necessities.'"
*Budd*, 711 F.3d at 842 (quoting *Farmer*, 511 U.S. at 834); see also
*Minix v. Canarecci*, 597 F.3d 824, 831 (7th Cir. 2010) (also
equating pretrial detainees to convicted prisoners). The
Supreme Court put a halt to that equation, however, when it
indicated that the interests of pretrial detainees and prisoners
derive from separate sources and must be assessed
differently. See *Kingsley*, 135 S. Ct. at 2473. The Court
elaborated its reasoning as follows:

> [T]he appropriate standard for a pretrial detainee's ex-
> cessive force claim is solely an objective one. For one
> thing, it is consistent with our precedent. We have said
> that "the Due Process Clause protects a pretrial de-
> tainee from the use of excessive force that amounts to
> punishment." *Graham* [*v. Connor*, 490 U.S. 386,] 395, n.
> 10 [(1989)]. And in *Bell* [*v. Wolfish*], we explained that
> such "punishment" can consist of actions taken with
> an "expressed intent to punish." 441 U.S. [520,] 538
> [(1979)]. But the *Bell* Court went on to explain that, in

the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not "rationally related to a legitimate non-punitive governmental purpose" or that the actions "appear excessive in relation to that purpose." *Id.,* at 561. The *Bell* Court applied this latter objective standard to evaluate a variety of prison conditions, including a prison's practice of double-bunking.

*Id.*

It is true that *Kingsley* directly addressed only claims of excessive force, and so some circuits have understood its holding to be confined to those facts. See *Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (collecting cases). We, however, have not taken that approach. Recognizing "that the Supreme Court has been signaling that courts must pay careful attention to the different status of pretrial detainees," we have held that a pretrial detainee's claims of inadequate medical care "are subject only to the objective unreasonableness inquiry identified in *Kingsley*." *Id*.

The plaintiffs in this case suggest that we should extend *Kingsley* further from the medical context to the general conditions-of-confinement problem we have here. We see no principled reason not to do so. To the contrary, as we recognized in *Miranda*, there is "nothing in the logic the Supreme Court used in *Kingsley* that would support this kind of dissection of the different types of claims that arise under the Fourteenth Amendment's Due Process Clause." *Id.* The Supreme Court has also said that medical care is simply one of the many conditions of confinement to which an imprisoned person is subjected. *Wilson*, 501 U.S. at 303 ("Indeed, the medical care a prisoner receives is just as much

a 'condition' of his confinement as the food he is fed, the clothes he is issued, the temperature he is subjected to in his cell, and the protection he is afforded against other inmates.").

As we recognized in *Miranda*, several of our sister circuits have viewed *Kingsley*'s holding as establishing that an objective inquiry applies to a variety of conditions-of-confinement claims, not just those involving excessive force. *Miranda*, 900 F.3d at 351–52; see also *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1120, 1122–25 (9th Cir. 2018) (medical-need claim); *Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2d Cir. 2017) (conditions of confinement generally); *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1070–71 (9th Cir. 2016) (*en banc*), *cert. denied*, 137 S. Ct. 831 (2017) (failure-to-protect claim). Since *Miranda* was decided, the Tenth Circuit has joined those that apply *Kingsley*'s objective inquiry to a claim other than excessive use of force. See *Colbruno v. Kessler*, —— F.3d ——, No. 18-1056, 2019 WL 2751434, at *3–4 (10th Cir. July 2, 2019). *Colbruno* involved an allegation that officers unnecessarily walked a pretrial detainee nude through the public halls of a hospital when acquiring clothing would have taken "at most a matter of minutes," and then handcuffed him to his hospital bed. *Id.* at *1, *5. In applying *Kingsley*'s objective standard, the Tenth Circuit made no distinction between excessive force, the forced unnecessary public nudity, the handcuffing to the hospital bed, or any other condition or restriction that might violate the Fourteenth Amendment. See *id.* at *6 (applying the *Kingsley* objective standard to both the nudity claim and the cuffing claim).

Like the Second and Tenth Circuits, we see no doctrinal reason to distinguish among different types of conditions-of-confinement claims for purposes of applying *Kingsley*'s

objective standard. Neither the Supreme Court's logic nor its language suggests that such a distinction is proper. See *Wilson*, 501 U.S. at 303; *Bell*, 441 U.S. at 539 ("[I]f a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees."); see also *Miranda*, 900 F.3d at 352. We therefore hold that *Kingsley*'s objective inquiry applies to all Fourteenth Amendment conditions-of-confinement claims brought by pretrial detainees.

## C

Though the right to water for drinking and personal sanitation, and the right to live in an environment free of accumulated human waste is clearly established, we must still ensure that plaintiffs have properly invoked that right in their complaint. To survive a challenge under Rule 12(b)(6), a complaint need plead only "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Qualified immunity may be appropriate at the pleading stage "where the plaintiff asserts the violation of a broad constitutional right that had not been articulated at the time the violation is alleged to have occurred." *Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000). But "the plaintiff is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity." *Id*. "Because a qualified immunity defense so closely depends 'on the facts of the case,' a 'complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds.'" *Reed*, 906 F.3d at 548 (quoting *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001)).

A single clogged toilet does not violate the Constitution, and prisoners are not entitled to Fiji Water on demand. But on the other end of the spectrum, a defendant cannot purposefully deny water until a prisoner is on the brink of death or force a prisoner permanently to live surrounded by her own excrement and that of others. The latter actions would be so obviously unconstitutional that qualified immunity could not protect the perpetrators. See *McDonald by McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir. 1992) (describing how qualified immunity is inappropriate when government action is "so egregious that no like case is on the books"). Our question is thus whether the severity and duration of the conditions Hardeman and the other plaintiffs allegedly experienced were so significant that, if proved in the end, they violated the Constitution.

This would be our conclusion even if we took into account the County's reason for shutting down the water. For present purposes, we will assume that Wathen's stated reason—that a water booster pump needed to be replaced—is accurate. We do note that he might not be entitled to this favorable assumption, as the complaint makes no mention of why the water in the jail was turned off. It is anyone's guess what discovery will reveal. Ensuring that repairs are done in a timely manner so that a jail has clean water is an obviously legitimate governmental objective. But regardless of the legitimacy of that objective, taking as true the conditions described in the complaint, with the plausible inferences we may draw from them, we find conditions of confinement that were objectively unreasonable and "excessive in relation to" any legitimate non-punitive purpose. *Kingsley*, 135 S. Ct. at 2473 (quoting *Bell*, 441 U.S. at 561). They thus crossed outside of constitutional bounds.

Some inconvenience was to be expected when Wathen shut off the jail's water. Yet, as we have stressed, the conditions alleged by the plaintiffs went far beyond inconvenience. Exposure to hundreds of unflushable toilets is objectively unreasonable. See *DeSpain*, 264 F.3d at 974–75; *Johnson*, 891 F.2d at 139; *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972) ("Causing a man to live, eat and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted."). This exposure, and the stench it caused, was compounded as insects became drawn to the standing feces and urine. Worse yet, inmates had insufficient water to shower, to drink, to take medicines, to brush their teeth, and to clean their living areas; complaining about this lack of water was met with punishment. This describes objectively unreasonable conditions for pretrial detainees. See *Woods*, 903 F.2d at 1082; *Dellis*, 257 F.3d at 512; *Johnson*, 217 F.3d at 732. It is also plausible that the grossly unsanitary conditions throughout the jail were compounded by inmates' dehydration-induced weakness and illness, thereby transforming what might otherwise have been a mere inconvenience into a problem of constitutional magnitude. See *Budd*, 711 F.3d at 843.

Wathen points to *Tesch v. County of Green Lake*, 157 F.3d 465 (7th Cir. 1998), to suggest that the conditions suffered by the plaintiffs were not constitutionally suspect. Tesch was a pretrial detainee with muscular dystrophy. *Id.* at 467. Because of his limited mobility, he could not obtain access to the sink in his cell for drinking water. *Id.* at 469. He was, however, given a beverage with each of his meals. *Id.* Tesch's deprivation lasted for less than two days. *Id.* We held that these conditions were not so problematic as to violate the Constitution. *Id.* at 476. But *Tesch* is easily distinguishable. It applied the more

demanding Eighth Amendment deliberate-indifference standard, as opposed to the objective inquiry that we apply here. See *id.* at 474–75. In addition, Tesch alleged nothing that exceeded "the general level of discomfort anyone can expect to experience while in custody." *Id*. at 476. By contrast, plaintiffs here allege an assortment of physical illnesses brought on by water deprivation and appallingly unsanitary conditions in the Lake County jail.

Finally, we note that because the water shutdown was planned, none of these issues was unforeseeable or incurable. Even cursory Internet research would have given Wathen a general idea of how much water the jail would need to allow the inmates to flush their toilets each day. And if Wathen could not procure enough water to fix that problem, there was a still more obvious solution: portable toilets. If, as the complaint alleges, Wathen was able to transport thousands of bottles of water (five per day for several hundred inmates) and additional tubs of water into the jail, it is not clear why he could not similarly import portable toilets into the jail. Indeed, recognizing that a lack of indoor plumbing is a common problem at campgrounds, county fairs, music festivals, and other large gatherings, numerous companies have sprung up to provide this exact service, including to government entities. See, *e.g. Vendor, Contract, and Payment Search*, *Contract to Service Sanitation*, CITY OF CHICAGO, https://webapps1.chicago.gov/vcsearch/city/contracts/24835 (showing "multiple awards for rental and maintenance of portable chemical toilets, sinks, waste water barrels, waterless hand sanitizer dispensers and fresh water trailers" between 2011 and 2020). Had a longer time for the outage been likely, Wathen perhaps could have transported the affected inmates to another facility until the Lake County jail's repairs were completed. At the

least, Wathen should have known that he needed to procure more water on the second and third days of the shutdown than he supplied for the first.

We do not list these alternatives to suggest that Wathen must have done one or more of these things to satisfy due process. The Constitution is not so inflexible. Instead, we merely note these examples to show that Wathen appears to have had numerous options that would have allowed the alleged pump repair without depriving the detainees of adequate water and sanitation facilities in the interim. Whether the detainees can prove what they have alleged, and what Wathen and his co-defendants can show in response, remains to be seen.

## III

"[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the … Due Process Clause." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). The Supreme Court's words apply with full force here. Hardeman and the other plaintiffs allege that the Lake County officials prevented them from caring for themselves and then deprived them of the most basic of human needs— water. The resulting alleged unsanitary conditions and physical harms were objectively unreasonable conditions of confinement that (if proven) violated the Fourteenth Amendment's due-process guarantee.

We thus AFFIRM the district court's order denying the defendants' request for qualified immunity.

SYKES, *Circuit Judge*, concurring in the judgment. After *Miranda v. County of Lake*, 900 F.3d 335 (7th Cir. 2018), it makes sense as a doctrinal matter to extend *Kingsley*'s objective standard to all conditions-of-confinement claims by pretrial detainees. As my colleagues explain, when a jail official harms a pretrial detainee, the constitutional right in question is the Fourteenth Amendment's guarantee of due process, not the Eighth Amendment's protection against cruel and unusual punishment. In *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2470–71 (2015), the Supreme Court confronted a pretrial detainee's claim that jail officers used excessive force against him. The Court explained that the plaintiff's due-process claim entailed two state-of-mind questions:

> The first concerns the defendant's state of mind with respect to his physical acts—*i.e.*, his state of mind with respect to the bringing about of certain physical consequences in the world. The second question concerns the defendant's state of mind with respect to whether his use of force was "excessive."

*Id.* at 2472.

As to the first question, the Court reiterated the rule that negligently inflicted harm is not actionable as a constitutional violation; rather, "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind." *Id.* That point was not disputed; the officers did not deny that they deliberately used force against the plaintiff. *Id.* As to the second question—"the defendant's state of mind with respect to the proper *interpretation* of the force … that the defendant deliberately (not accidentally or negligently) used"—the Court ruled that the plaintiff need not establish

that the officers subjectively intended to use excessive force. *Id.* Rather, at this step of the decision framework, the Court held that an objective inquiry applies. *Id.* at 2472–73. A pretrial detainee can prevail on an excessive-force claim by proving that the force deliberately used against him was objectively unreasonable—namely, by providing "objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* at 2473–74.

In *Miranda* we extended *Kingsley*'s "objective unreasonableness" standard to a claim that a pretrial detainee received constitutionally inadequate medical care. 900 F.3d at 352–54. We emphasized, however, that *Kingsley* retained the rule that mere negligence is not a constitutional violation. *Id.* at 353–54. *Miranda* involved the death of a mentally ill jail inmate who refused food and water. Her estate sued the jail officials and medical providers involved in her care. To prevail against the medical providers, the estate was required to prove that they "acted purposefully, knowingly, or perhaps … recklessly when they considered the consequences of their handling of [her] case." *Id.* at 353. The estate's evidence was sufficient to support an inference that the medical providers "made the decision to continue observing [the inmate] in the jail, rather than transporting her to the hospital, with purposeful, knowing, or reckless disregard of the consequences." *Id.* at 354. Accordingly, we held that "a jury must decide whether the doctors' deliberate failure to act was objectively reasonable." *Id.*

Like my colleagues, I see no principled reason to treat general conditions-of-confinement claims differently than medical conditions-of-confinement claims. I therefore agree

that this case is governed by *Kingsley*'s objective standard—but importantly, only at the step in the liability framework that requires an *interpretation* of the conditions to which the plaintiffs were subjected during the three-day water shutoff. As I've just explained, under *Kingsley* the constitutional claim still carries a subjective component. To prevail, the plaintiffs must prove that the defendants acted purposefully, knowingly, or recklessly; negligence is not enough. In addition, nothing in *Kingsley* removed the threshold requirement in every conditions-of-confinement claim: "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). That's because only "objectively [and] sufficiently serious" deprivations are actionable as a violation of the Constitution. *Id.* (quotation marks omitted). Typically, this refers to the denial of life's basic necessities, such as "adequate food, clothing, shelter, and medical care." *Id.* at 832.

So to prevail on a claim alleging unconstitutional conditions of pretrial confinement, the plaintiff must prove three elements: (1) the conditions in question are or were objectively serious (or if the claim is for inadequate medical care, his medical condition is or was objectively serious); (2) the defendant acted purposefully, knowingly, or recklessly with respect to the consequences of his actions; and (3) the defendant's actions were objectively unreasonable—that is, "not rationally related to a legitimate governmental objective or … excessive in relation to that purpose." *Kingsley*, 135 S. Ct. at 2473–74.

With these understandings, I agree that the qualified-immunity defense fails at this early stage of the litigation.

Qualified immunity is normally hard to win on a Rule 12(b)(6) motion. *See, e.g.*, *Reed v. Palmer*, 906 F.3d 540, 548–49 (7th Cir. 2018). This case is no exception. The factual allegations in the complaint describe a three-day water shutoff in the Lake County Jail in which the plaintiffs and other inmates were deprived of the minimal amount of water necessary to stay hydrated, take medication, maintain basic hygiene, and flush waste from their cell toilets. The complaint further alleges that as a result of the deteriorating conditions during the three-day shutdown, the plaintiffs and other inmates suffered "a variety of ailments, including but not limited to, dehydration, migraine headaches, sickness, dizziness, constipation, and general malaise." Finally, the complaint alleges that the defendants intentionally and with deliberate indifference subjected the plaintiffs and other inmates to these conditions. I agree with my colleagues that these allegations state a claim for "denial of the minimal civilized measure of life's necessities," *Farmer*, 511 U.S. at 834 (quotation marks omitted), a clearly established constitutional violation. Majority Op. at pp. 5–6.

The defendants say they had a legitimate purpose for shutting off the water (to replace a water pump) and the ensuing conditions in the jail were not excessive in relation to that purpose. As my colleagues note, the factual basis for this argument lies outside the complaint. Regardless, we cannot evaluate the defendants' response to the water-pump contingency without a factual record. At this stage we take the allegations in the complaint as true, and the plaintiffs are entitled to all reasonable inferences in their favor. The defendants may of course renew their immunity claim as the facts develop. *Reed*, 906 F.3d at 548–49 (explaining the difference in the qualified-immunity analysis at the pleadings

stage and on summary judgment). For now, the district judge was right to reject the defense.